451 So.2d 743 (1984)
Howard Monteville NEAL
v.
STATE of Mississippi.
No. 54739.
Supreme Court of Mississippi.
May 23, 1984.
Rehearing Denied July 11, 1984.
*747 John L. Clay, Jackson, Joe Dale Walker, Monticello, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, Richard Douglass, Hattiesburg, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Howard Monteville Neal has been indicted, tried and convicted of the capital murder of his 13-year-old half-niece, Amanda Joy Neal. The jury subsequently decreed that for his crime he must die.
At the core of this appeal is Neal's challenge to the admissibility into evidence at his trial of a full confession he gave law enforcement officers following his arrest. To be sure, if the confession be excluded Neal would go free. There is no other probative evidence in the record sufficient to sustain a conviction (or obtain a new one). After a careful scrutiny, we have concluded that the trial judge correctly allowed the confession to be used against Neal.
Finding no other errors requiring reversal, our duty becomes clear: the affirmance of the conviction of Howard Monteville Neal of the crime of capital murder and his consequent sentence of death.

II.

A.
The victim of this tragic crime was Amanda Joy Neal, a 13-year-old girl. Amanda Joy lived with her mother in Hattiesburg, as her parents were divorced. On January 23, 1981, Amanda Joy left to spend the weekend with her father, Bobby Neal, the defendant's half-brother on his farm near Monticello in Lawrence County, Mississippi.
On the evening of January 24, 1981, Amanda Joy and her father drove to the home of her aunt, Betty Sue Langston, to pick up Mrs. Langston's daughter, Amanda Joy's cousin and close friend, Melanie Sue *748 Polk. The two girls had planned to spend the night together at Amanda's father's home and then attend church together the next morning. Bobby Neal and the two girls left the Langston home at approximately 10:00 o'clock on Saturday night. This was the last anyone saw any of the three alive.
On Sunday evening, January 25, Melanie Sue did not return home. As the evening wore on, Mrs. Langston became concerned. At 10:00 p.m. she went to Bobby Neal's home. She found his truck in the driveway and let herself into the house, which was unlocked. There was no evidence of anything being amiss, but she noticed that Bobby Neal's glasses, which he wore everywhere, were lying on a table in his room. Alarmed, Mrs. Langston called the Lawrence County Sheriff's office, which in turn organized a search effort for the missing trio. For ten days there was no evidence of their whereabouts.
On February 6, 1981, a man on his way to a fishing hole discovered Amanda Joy's body. It was lying approximately ten feet away from a logging road branching off old highway 27 in Lawrence County. The area where the body lay was not visible from the main road because it was down in a hollow.
Amanda Joy's body was clothed in a tee-shirt and pants that were either pajamas or the bottoms of a warmup suit. She was wearing no shoes. There was a gunshot wound in the area of her abdomen, bruises about her face and head, evidence of manual strangulation, and bruises and lacerations about her left wrist. The State pathologist testified that her wound would not have caused instant death and that she could have lived between five minutes and one-half hour after being shot.
On the date the body was found, investigating officers, in an attempt to find leads in the case, showed a picture of the defendant to Kenneth Hoffman, who owned Della's Motel in Brookhaven. Hoffman told the officers that the man looked familiar. He then looked through his registration file and found a card that he had filled out for the defendant between 6:45 and 7:00 A.M. on January 24, 1981. Hoffman told the officers that Neal was driving a green Ford Torino.
On March 6, 1981, Howard Monteville Neal was arrested for shoplifting in Stockton, California. Police officials there ran a routine teletype check on Neal. They discovered that Neal was wanted in Mississippi for questioning in connection with the homicides of Bobby Neal, Amanda Joy Neal, and Melanie Sue Polk.
After substantial interrogation (which will be described in more detail in connection with the issue regarding the suppression of the confession), Neal told Stockton Police Sergeant Wilson Stewart what had happened. In Stewart's words:
Mr. Neal said that he drove to Brookhaven from Texas where he lived, and he said that he got into Brookhaven on a Sunday morning, maybe about 6 o'clock in the morning, and he stopped at this little motel and left his wife there, and that he went on over to his brother, Bobby's place. He said that he got over there maybe around 9 o'clock, and he said that he was there at the house for maybe a little over an hour; that when he got to the house, that Bobby was there, and that Bobby's daughter Amanda Joy was there, and then there was a niece, a younger girl that was there. He said that he left that place with Bobby and the two girls to go for a ride in his car, which was a little green Ford that he was driving, and that's the one that he was driving at the time that he was in Stockton. He said that when he left the house with them that they were accompanying him of their own free will; that Bobby rode in the back seat, and the two girls rode in the front seat of the car with him. He said that he started driving in the car, and that Bobby got upset because he started playing with the leg of one of the girls, Amanda Joy, and he said when Bobby got upset that he stopped the car. He at first told me that he was in a tree area, and that the two girls stayed in the car, and he got out *749 with Bobby and went for a walk, and he had this gun with him. He later changed that to the fact that he was at a gravel pit area, and that he left the girls in the car, and he walked a short distance with Bobby. He said that he shot Bobby, and 
... .
A. He said that he had left the car with Bobby; that he had left the two girls in the car, and I asked him at that time if the two girls had been restrained in any way or for what reason would they have stayed in the car, and he said that he didn't restrain them in any way; that he told them that he was going for a walk with Bobby. He said that after he shot Bobby and returned to the car  I asked him if the girls had said anything about hearing the shot, and he said that they did say they had heard the shot, and he explained to them that he had shot the gun into the air. He explained that he had shot the gun into the air; that Bobby had been told by him to go on home, and he said the girls seemed to accept that. I asked him why they would believe that since Bobby was so far from home, and he said, "Well, I thought they did believe, and I left that area with them in the car." He said that  I asked them were they upset about the fact that Bobby would have had his hands tied, and he said Bobby didn't have his hands tied at any time, and he didn't tie them, and they were not tied, and that the girls didn't see his hands tied. He then said that he went on to this other area with the girls, and that he parked his car off the roadway in this tree area; that he put a blanket out along side the ground and that he was on the blanket with Amanda Joy. He said that he was playing around with her a little bit; that he had sexual intercourse with her; that she was cooperative with him, and I asked him where the other girl was at this time, if she was being restrained in any way, and he said that she sat in the car, and just sat in the car on her own. He said that when he got through having sexual intercourse with Amanda Joy, that she put her clothes on and got back in the car, and he told her that he was going to have sexual intercourse with the smaller girl, and that she sat in the car while he got out on the blanket with the other girl. He said that he started to do this, and then stopped and let the girl put her clothes back on, and then he had both girls get out of the car. He said that he shot Amanda Joy in what he thought was in the area of the chest, that she was standing up right by the other little girl. He said that when he did this, that the other little girl screamed and so he turned toward her and shot her. I asked him if both girls were together at this time, and he said yes. I told him that my understanding was that the  one of the girls was a little distance away, and he said the only way that that little girl could have gotten away from the other one was is if she had crawled away on her own because they were together at the time that he shot them. He said that he got back in the car and then he drove back to the motel and picked up his family at the motel and drove back through Jackson and across the stateline on the Interstate from Jackson and went back to Texas.

B.
On August 3, 1981, Howard Monteville Neal, defendant below and appellant here, was formally charged with the capital murder of Amanda Joy Neal while he was engaged in the kidnapping of Amanda Joy Neal contrary to Miss.Code Ann § 97-3-19(2)(e) (Supp. 1983). Neal entered a plea of not guilty. On October 30, 1981, the Circuit Court ordered venue changed from Lawrence County to Lamar County.
On the morning of February 2, 1982, the case was called for trial in the Circuit Court of Lamar County, Mississippi. The trial lasted for two days. On February 4, 1982, the jury returned a unanimous verdict that Neal was guilty as charged in the indictment.
Thereafter, on the same day, Howard Monteville Neal was put to trial on the *750 question of sentence. The jury by its verdict found that the aggravating circumstances outweighed the mitigating circumstances and that Neal should be put to death in the manner prescribed by law. From this conviction and sentence, Neal appeals.

III.
We reaffirm at the outset our commitment to heightened scrutiny on appeal in cases where the sentence of death has been imposed. Concurring in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Stewart wrote:
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
408 U.S. at 306, 96 S.Ct. at 2760, 33 L.Ed.2d at 388.
This theme, the unique nature of the death penalty, has been repeated time and time again. See, e.g., Furman v. Georgia, supra, 408 U.S. at 287-289, 92 S.Ct. at 2751, 3752, 33 L.Ed.2d at 376-378 (Brennan, J., concurring); Gregg v. Georgia, 428 U.S. 153, 187-188, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859, 882, 883 (1976); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976); Gardner v. Florida, 430 U.S. 349, 357-358, 97 S.Ct. 1197, 1204-05, 51 L.Ed.2d 393, 402 (1977); Coker v. Georgia, 433 U.S. 584, 598, 97 S.Ct. 2861, 2869, 53 L.Ed.2d 982 (1977); Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 989-990 (1978); Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392, 403 (1980); and California v. Ramos, ___ U.S. ___, ___, 103 S.Ct. 3446, 3451, 77 L.Ed.2d 1171, 1179 (1983).
This Court has repeatedly recognized that appellate review in capital cases is different from that in other cases. Irving v. State, 361 So.2d 1360 (Miss. 1978) observes:
We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. [Citation omitted] What may be harmless error in a case with less at stake becomes reversible error when the penalty is death. [Citations omitted]. 361 So.2d at 1363.
See also, Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982), and Williams v. State, 445 So.2d 798, 810-811 (Miss. 1984).

GUILT PHASE

IV.

A.
Neal complains of the trial court's ruling allowing Detective Sergeant Wilson Stewart to relate to the jury the confession given by Neal on March 8, 1981. Neal charges that this confession was, as a matter of law, involuntary given the facts of this case. If this be so, the confession, of course, would be inadmissible, for such is the long-established constitutional elaboration upon the privilege against self-incrimination secured to all persons, first, by the Constitution of the United States in the Fifth and Fourteenth Amendments and, second, by the Mississippi Constitution of 1890, Art. III, § 26.
For the reasons set forth below, this assignment of error is not well taken.

B.
Well prior to trial, Neal filed a motion to suppress his confession. The motion was carried with the case. When the state sought to introduce the confession at trial, an extensive in-chambers hearing was held regarding its admissibility.
The evidence at the suppression hearing, reflected that on March 6, 1981, Neal was detained in the New Deal Grocery Store in Stockton, California, for shoplifting. A routine teletype check by Stockton law enforcement authorities revealed that Neal was wanted for questioning in Mississippi. *751 Neal was taken to the police station and first given his Miranda[1] warnings by Officer Mike Ries. Ries then questioned Neal briefly. Neal made no inculpatory statements.
Later that day, Detective Sergeant Wilson Stewart questioned Neal. In the presence of Ries, Stewart again advised Neal of his privilege against self-incrimination as elaborated in Miranda. Neal remained in custody at the Stockton Police Station from approximately 2:30 p.m. until 11:30 p.m. on March 6. Stewart questioned Neal intermittently but only for an aggregate of approximately 1 1/2 hours. Stewart spent most of the time in communication with officers in Mississippi and in connection with other duties. Neal made no inculpatory statements to anyone on March 6th.
On the night of March 6th, Neal was taken to the county jail about ten miles out of Stockton where he remained for the evening. Stewart came to the jail shortly after noon on Saturday, March 7th, and once again interviewed Neal. Prior to this interview session, Stewart once again advised Neal of his Miranda rights. As he had done the day before, Neal initially denied that he had been in Mississippi at any time in the past two or three years. Subsequently during questioning Neal admitted that he knew the authorities could prove he was in Mississippi, but he wasn't going to admit it because if he did they would kill him. At approximately 9:30 p.m. on March 7, 1981, after approximately an hour of questioning, Neal told Detective Sergeant Stewart that he had gone to Bobby Neal's house in Mississippi on January 25, 1981. He then told Stewart he wanted to think about it some more before he talked any further about what had happened. Neal made no further inculpatory statements on Saturday, March 7.
On Sunday, March 8, Detective Sergeant Stewart arrived to resume questioning of Neal at approximately 12:45 p.m. He again advised Neal fully of his rights under Miranda. At this time Neal gave the confession described in section II(A) of this opinion, which, of course, contained the admission that he had killed Amanda Joy Neal.
There is no evidence that any threats, promises, or any form of physical abuse or coercion were used on Neal at any time. At no time did he request the assistance of counsel. There is no evidence that on any occasion during the questioning Neal was under the influence of drugs or liquor. The record of the suppression hearing is replete with the inference that Detective Sergeant Stewart was courteous, considerate, patient and persistent. He testified unequivocally that the statement given by Neal was knowingly and voluntarily given, that it was given at a time when Neal understood and appreciated the gravity of the charges against him, and that it was given at a time when Neal was fully aware of his constitutional privilege against self-incrimination and his right to counsel.
Neal did not testify at the suppression hearing. Rather, the defense offered was that Neal was mentally retarded and that, under the circumstances in question, he was incapable as a matter of law of giving a voluntary confession.
By way of background to this point, defense counsel cites Neal's personal history. Neal was born on September 14, 1953. When he was ten years old, he was sent to the Ellisville State School. Neal had been unable to advance beyond the second grade in public schools. Ellisville State School is a school operated by the State of Mississippi for mentally retarded youth. Miss. Code Ann. §§ 41-19-101 et seq. (1972). Neal remained at Ellisville until he was sixteen. He was then transferred to a unit for retarded persons at the Mississippi State Hospital at Whitfield, where he remained until he was eighteen.
Defendant called Dr. Dana Alexander, a clinical psychologist who had examined Neal at the Court's request. Dr. Alexander testified that she had administered a *752 valid and standardized I.Q. test to Neal which had revealed that Neal had a full scale I.Q. of approximately 54.[2] This would place Neal at the low end of the mild mental retardation range.[3]
Dr. Alexander's testing also revealed that Neal suffered from an organic brain syndrome known as dementia. This is a disease that typically affects one's memory and one's ability to control his impulses. After describing Neal's other personality traits, Dr. Alexander was given a hypothetical question concerning whether Neal understood the Miranda warnings as they were given. She gave her opinion that he could not understand them unless they were explained carefully and in extremely simple terms.
Dr. Charlton Stanley, a forensic psychologist then associated with the Mississippi State Hospital at Whitfield, testified for the State at the suppression hearing. The I.Q. test administered at Whitfield had produced a full scale I.Q. score of 60.[4] Dr. Stanley gave his opinion that Neal was to some degree faking on his I.Q. test. He further explained that the Whitfield team had found no evidence of an organic brain syndrome, although he did not give the test which would have revealed it. Significantly, Dr. Stanley testified that he had read to Neal the standard Miranda warning before administering the I.Q. test. He gave his opinion that Neal understood the Miranda warnings at that time and that he was perfectly capable of understanding the Miranda warnings under the circumstances existing in Stockton, California on March 8, 1981.
Other facts in the record are that Neal was married and had a child, that he traveled around the country a good bit, that he had worked as an oil field worker though for the most part he was a drifter, and that on the day of the murders he had checked his family into a motel in Brookhaven. The facts and circumstances regarding Neal's mode of living and experiences seem to suggest that he possessed a minimal capacity to function in society and to understand and communicate with others regarding the basic necessities of interdependent living.
After hearing all of the evidence, the trial judge held that the confession ws admissible and could be presented to the jury. Specifically, the trial judge announced:
BY THE COURT:
All right, let the record show that the Court having heard the testimony on the Motion to Suppress the Confession or Statement of the Defendant and the Court now being ready to rule on said motion; does find that the statement made to Sargent Wilson Stewart was made by the Defendant voluntarily and after he knowingly waived his rights under the Miranda Warning and that the same was free and voluntarily given. Therefore, the Motion to Suppress the Statement, be and the same is hereby overruled.

*753 C.
In challenging this ruling on appeal, Neal is necessarily restricted by established limits upon our scope of review. We are concerned here in substantial part with a finding of fact. So long as the trial court applies the correct legal standards, we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous. See, e.g., Ratliff v. State, 317 So.2d 403, 405 (Miss. 1975); Hall v. State, 427 So.2d 957, 960 (Miss. 1983). Cf. Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983).
We emphasize that the mere giving of the Miranda warnings, no matter how meticulous, no matter how often repeated, does not render admissible any inculpatory statement thereafter given by the accused. The rights of which the accused is Miranda-warned must thereafter be waived  intelligently, knowingly and voluntarily. Whether there has been an intelligent, knowing and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances. Edwards v. Arizona, 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 1885 n. 9, 68 L.Ed.2d 378, 387 (1981).
On appeal, our inquiry is twofold: Did the trial judge apply the correct legal standards in his evaluation of the facts? If the answer here is affirmative, we then inquire whether there is substantial evidence to support the finding made by the trial judge. An affirmative answer to both questions generally requires an affirmance.

D.
In connection with our evaluation of whether the trial judge applied the appropriate legal standards, we must, of course, ascertain that he applied the correct burden of proof. It is well established in this State that, where the voluntariness of a confession has been put in issue, the State has the burden of proving voluntariness beyond a reasonable doubt. Dover v. State, 227 So.2d 296 (Miss. 1969); Harvey v. State, 207 So.2d 108 (Miss. 1968); Stevens v. State, 228 So.2d 888, 889 (Miss. 1968).
When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver. Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966); Abston v. State, 361 So.2d 1384, 1391 (Miss. 1978).
In the case at bar, our primary focus is on the question whether Neal voluntarily and knowingly waived his rights on the afternoon of Sunday, March 8, 1981, the third day of his custody. Specifically, we are concerned with whether he then and there waived his privilege against self-incrimination, secured by the Fifth and Fourteenth Amendments to the Constitution of the United States, as well as by Article III, Section 26, of the Mississippi Constitution of 1890, and his right to the assistance of counsel incident to his in-custody interrogation, as secured by the Sixth and Fourteenth Amendments to the Constitution of the United States, and by Article III, Section 26 of the Mississippi Constitution of 1890.[5]

*754 1.
We are concerned here with a refinement of the familiar Miranda rule: Once an accused states that he wishes questioning to cease, when and under what circumstances may law enforcement authorities resume interrogation and obtain an admissible inculpatory statement?
Here on the evening of March 7, 1981, Neal had first admitted that he had been in Mississippi and at Bobby Neal's house on the day of the murder. He apparently was about to tell Officer Stewart the whole story when he stopped. According to Stewart,
He said that he had rather think about it and talk to me more about it the next day as to whether he wanted to tell me what happened after that point.
It is established criminal constitutional law that, even if an accused voluntarily begins answering incriminating questions put by law enforcement officials, he has the right to stop at any time. In Miranda the Supreme Court wrote
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. 384 U.S. at 473, 474, 86 S.Ct. at 1627, 1628, 16 L.Ed.2d at 723.
The Supreme Court has subsequently held that the accused's right to cut off questioning must be scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975); Fare v. Michael C., 442 U.S. 707, 717-719, 99 S.Ct. 2560, 2567-2569, 61 L.Ed.2d 197 (1979); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We regard the law as well established and unequivocally clear: One criminally accused and under police interrogation has a right to stop and claim his constitutional privilege against further self-incrimination at any time he wishes. In the Interest of Wilder, 347 So.2d 520, 521 (Miss. 1977); Bell v. State, 443 So.2d 16, 21 (Miss. 1983).
Both federal and state constitutions similarly require that a mid-interrogation request for assistance of counsel be scrupulously honored. See, e.g., Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Abston v. State, 361 So.2d 1384 (Miss. 1978).
In the context of the facts of this case, Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) is important. In Bradshaw, the accused was undergoing custodial interrogation regarding a homicide. After answering a few questions, the accused said "I do want an attorney before it goes very much further". The interrogation ceased. "Some time later" the defendant asked "Well, what is going to happen to me?" Unlike in the case at bar, law enforcement officials immediately re-advised him of his Miranda rights and specifically of his right to counsel. A discussion followed.
Reading from the Bradshaw opinion,
The next day, following another reading to respondent of his Miranda rights, and respondent's signing a written waiver of those rights, the polygraph was administered. At its conclusion, the examiner told respondent that he did not believe respondent was telling the truth. Respondent then recanted his earlier story, admitting that he had been at the wheel of the vehicle in which Reynolds was killed, that he had consumed a considerable amount of alcohol, and that he had passed out at the wheel before the vehicle left the roadway and came to rest in the creek.
___ U.S. at ___, 103 S.Ct. at 2833, 77 L.Ed.2d at 410.
Under these circumstances, the Supreme Court held that receipt of Bradshaw's inculpatory statements into evidence at his trial did not violate any right secured to him under the Constitution of the United States. Bradshaw thus stands as solid authority *755 for affirmance here, at least on the confession issue insofar as the federal constitution has been implicated.[6] A similar approach is appropriate under Article III, Section 26 of our Constitution.
We emphasize the contours of the rule:
An accused may stop talking during in-custody interrogation. He may request counsel at any time. Notwithstanding an earlier valid waiver of his privilege against self-incrimination and his right to counsel, an accused may revoke that waiver. Any such revocation, however expressed, must be scrupulously honored.
Following such a revocation, the accused may re-waive his rights. Where, as here and in Bradshaw, on the day following the revocation the accused is re-advised of his Miranda rights, if he thereafter knowingly, intelligently and voluntarily re-waives those rights, any subsequent inculpatory statement may be received in evidence against him.
In the case at bar, Detective Sgt. Stewart exhibited commendable professionalism. On the evening of March 7, he respected Neal's request to stop the interrogation to give him time to "think about it". At that time Neal had somewhat incriminated himself. Minutes earlier Neal had said
"I know that you can prove that I was there, but I can't tell you that I was there because if I tell you that I was there, they will kill me."
Stewart must have sensed that he was on the verge of obtaining a full confession. After a day and a half of intermittent interrogation, Stewart surely knew that his subject was of subnormal mental abilities. He no doubt was aware that right then and there on the evening of March 7 he could have subtly coaxed Neal into a full confession. Notwithstanding, Stewart scrupulously honored Neal's request to "think about it" and took him back to his cell for the night.
Questioning did not resume until after noon on the next day  some 15 hours later. Neal had been allowed a good night's sleep and had been properly fed.
Having in mind Neal's Saturday evening statement that "he would talk to me more about it the next day", Stewart saw Neal at approximately 12:45 p.m. on Sunday, March 8, 1981. At that time Stewart re-advised Neal of his Miranda rights, to-wit:
I advised him that he had the right to remain silent and anything that he said could and would be used against him in a Court of Law. That he had the right to an attorney and have him present before any questioning, and if he couldn't afford an attorney, one would be represented  would be given to him without charge. I asked him if he understood those rights, and he said that he did. I asked him, keeping those rights in mind, did he wish to discuss the matter further, and he said that he would, and I told him that at any time he wanted to stop talking we would.
Thereafter, Neal made the confession set forth in Section II(A) above.

2.
This brings us to the issue of Neal's mental retardation. In his voluntariness determination, the trial judge must first determine whether the accused, prior to the confession, understood (a) the content and substance of the Miranda warnings and (b) the nature of the charges of which he was accused or with respect to which he was under investigation.
This Court has repeatedly recognized that an accused's intelligence level and mental abilities are an important factor to be considered in determining whether a confession has voluntarily been given.[7] See, e.g., Ford v. State, 75 Miss. 101, 21 So. *756 524 (1897) (13-year-old "dull negro boy"; held the confession should have been suppressed); Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900) (confession made by a dull black boy held inadmissible); Harvey v. State, 207 So.2d 108 (Miss. 1968) (defendant had I.Q. of 60 and suffered from brain disfunction; confession suppressed); Dover v. State, 227 So.2d 296 (Miss. 1969) (45-year-old defendant with I.Q. of 60 confessed; Court held confession inadmissible); Hancock v. State, 299 So.2d 188 (Miss. 1974) (dull normal man's confession admissible after Miranda warnings); Gator v. State, 402 So.2d 316 (Miss. 1981) (confession held admissible where defendant's I.Q. was placed at range between 43 and 70). See also, Lee v. State, 338 So.2d 399, 401 (Miss. 1976); Harrison v. State, 285 So.2d 889, 890 (Miss. 1973).
Not one of these cases announces a per se rule.[8] They stand collectively for the proposition that the mental abilities of an accused are a factor  but only one factor  to be considered. When all of the facts and circumstances of the particular confession and the interrogation leading up to it are considered  including the accused's abilities  the trial judge must find as a fact whether the confession was intelligently and voluntarily made. That fact finding will not be disturbed here unless we find it clearly erroneous.
Neal alternatively contends that, if his retardation in and of itself does not establish involuntariness, coupling it with three days of interrogation surely does. Here, Neal implicitly recognizes the approach articulated in Williamson v. State, 330 So.2d 272 (Miss. 1976), where we wrote:
A confession will not ordinarily be excluded merely because the person making the confession is mentally weak. Until it is shown that a weak-minded person has been overreached to the end that he has divulged that which he would not have divulged had he not been overreached, his voluntary confession is admissible. 330 So.2d at 276.
In the context of the intermittent three-day interrogation, we regard it as important to keep further in mind the Williamson recognition:
That the will of a person who is of weak intellect may be more easily overcome than that of one who is more intelligent. 330 So.2d at 276.
All of this, of course, is nothing more than an application of the totality of the circumstances test in the context of a mentally retarded defendant. This is what the trial judge did in overruling the motion to suppress.

E.
At the suppression hearing, the evidence reflected that Neal had deliberately over a three-day period of time considered whether he would admit his involvement in the Lawrence County killings. On the first day, he denied having been present in Mississippi for the past two or three years. On the second day, he recognized that if he admitted to having been present in Mississippi, "they will kill me". This shows an intelligent appreciation of the jeopardy he was in. The record reflects that Neal was warned of his Miranda rights at least five times prior to his March 8th confession.
At no time did he in any way request to see or consult with an attorney. Detective Sergeant Stewart gave a credible opinion that Neal understood his rights and confessed voluntarily. It is significant that the confession itself was given after Neal had been allowed over twelve hours of rest, during which time he had been properly fed. The evidence at the suppression hearing reflects that Neal was fresh on the afternoon of March 8, when he gave his confession.
The fact of Neal's low level of intellectual functioning was thoroughly explored at the suppression hearing. Dr. Stanley's testimony certainly formed a credible basis for a finding that Neal was capable of understanding  and intelligently relinquishing
*757  his constitutional privilege against self-incrimination.
At the conclusion of the lengthy suppression hearing, the trial judge ruled that the confession was admissible. His ruling is capsuled in his determination that the confession was voluntary. He applied the correct rules of law, although to be sure he did not articulate those at the length we have deemed appropriate here. There is more than substantial evidence in the record to support his findings. Having well in mind our limited scope of review in matters such as these, we affirm.

F.
Finally, Neal charges that his right to be taken before a judicial officer for a probable cause determination promptly following his arrest has been violated. This it is said rendered Neal's custody from March 6 to March 8 illegal, as a result of which the confession of March 8 becomes the fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
The point is spurious. The arrest of Neal on the shoplifting charge was wholly lawful. He was advised repeatedly of his privilege against self-incrimination and of his right to counsel. In the end he knowingly and voluntarily waived those rights. Repeated Miranda warnings coupled with the passage of enough time to allow an accused to become acclimated to his surroundings followed thereafter by a voluntary waiver are generally more than sufficient to remove from a subsequent confession the taint, if any, of delay in taking the accused before a committing magistrate. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Hall v. State, 427 So.2d 957 (Miss. 1983).

V.
To establish Neal's guilt of capital murder, the State was required not only to prove that Neal killed Amanda Joy, but also that he did so in the course of his commission of another serious felony. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1983). In this case the underlying felony is kidnapping. On this appeal, Neal complains that the evidence is insufficient as a matter of law to sustain a jury finding against him on the kidnapping charge.
It is hornbook criminal law that before a conviction may stand the State must prove each element of the offense. McVeay v. State, 355 So.2d 1389, 1391 (Miss. 1978). Not only is this a requirement of the law of this State, due process requires that the State prove each element of the offense beyond a reasonable doubt. Patterson v. York, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281, 292 (1977); Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576-577 (1979). Leaving the killing of Amanda Joy completely aside, our question is whether, under the evidence, taken in the light most favorable to the verdict, it may be said that no reasonable hypothetical juror could find beyond a reasonable doubt that Neal was guilty of the kidnapping of Amanda Joy.
Our inquiry is further constricted by the definition of kidnapping submitted to the jury.[9] The jury was instructed that the State was required to prove that Neal
... did willfully, unlawfully and feloniously kidnap Amanda Joy Neal, a human being, by forcing the said Amanda Joy *758 Neal to enter or remain in his automobile and while confined therein, drove away with her in his automobile against her will from a place where she had a right to be en route and to a destination unknown to her friends and acquaintances, ....[10]
According to Neal's confession, Amanda Joy at all times accompanied him of her own free will. There is substantial circumstantial evidence, however, indicating that this was simply not so. For one thing, Amanda Joy was wearing a tee shirt, warmup pants and no shoes. This is not the sort of clothing one would normally wear if voluntarily going for an automobile ride in late January. That her father Bobby Neal had left his glasses at home suggests the possibility that all three  Bobby, Amanda Joy and Melanie  may have accompanied Neal involuntarily.
Amanda Joy's body was found in a wooded, secluded area some twenty miles from her home. A reasonable juror may well have believed that she would not have voluntarily accompanied Neal to such an area. Moreover, the bruises about her head and shoulders, the evidence of manual strangulation, and the lacerations on her wrist would indicate that force was used at some point in time to make her do something against her will.
From the evidence it is quite difficult to imagine that Amanda Joy would have continued voluntarily in the custody of Neal once he had killed her father. Recall that Neal took his half-brother, Bobby Neal, out into the woods. Amanda Joy heard a shot. The defendant returned without Amanda's father, stating that he had told him to go home  some fifteen miles away. It is simply incredible to suggest that Amanda Joy  after hearing the shot and observing her father's failure to return  voluntarily accompanied Neal on the last five miles of the fatal journey through an out-of-the-way, backwoods area of Lawrence County.
Under our system, the jury is charged with the responsibility for weighing and considering conflicting evidence and the credibility of witnesses. See, e.g., Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980); Pearson v. State, 428 So.2d 1361, 1363 (Miss. 1983). The jury in this case was correctly  though unnecessarily restrictively  instructed regarding the elements of kidnapping. By its verdict the jury has necessarily found that the defendant was guilty of the kidnapping of Amanda Joy Neal prior to her murder. Considering the evidence in the light most favorable to the verdict, we easily conclude that reasonable hypothetical jurors could find beyond a reasonable doubt that Neal was in fact guilty of kidnapping as that offense had been described and defined in the instructions of the court.

VI.
Neal next complains that the State impermissibly was allowed to present evidence to the jury that Neal was guilty of the commission of other crimes. Neal complains here that four other specific crimes were placed before the jury, to-wit: the alleged rape of Amanda Joy, the murder of Bobby Neal, the attempted rape of Melanie Sue Polk, and the murder of Melanie Sue Polk. This evidence was all received by the jury as a part of Neal's confession.
Evidence of prior offenses committed by a defendant, not resulting in a conviction, is generally inadmissible either for impeachment purposes or as a part of the State's case in chief. Mason v. State, 429 So.2d 569, 572-73 (Miss. 1983); Gray v. State, 351 So.2d 1342 (Miss. 1977); Mills v. *759 State, 304 So.2d 651 (Miss. 1974); Allison v. State, 274 So.2d 678 (Miss. 1973). On the other hand, our law recognizes certain exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. Such proof of another crime is also admissible where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See, e.g., Johnson v. State, 416 So.2d 383 (Miss. 1982); Mason v. State, 429 So.2d 569, 572-73 (Miss. 1983); Woods v. State, 393 So.2d 1319, 1325 (Miss. 1981).
One of the accepted exceptions to the general disallowance of evidence of other crimes is where that evidence tends to prove motive. According to defendant's confession, the killing of Bobby Neal preceded in time the killing of Amanda Joy. Quite logically, the State could argue that Neal killed Amanda Joy to be sure that he left no witnesses to his killing of her father, Bobby Neal. See, e.g., Johnson v. State, 416 So.2d 383, 386-387; Tolbert v. State, 407 So.2d 815 (Miss. 1981).
Beyond that, evidence of defendant's crimes against Bobby Neal and Melanie Sue Polk were admissible because they were integrally related in time, place and fact with the murder of Amanda Joy. See, e.g., Johnson v. State, 416 So.2d 383, 387 (Miss. 1982), wherein we held that evidence of burglary and attempted rape were admissible in a capital murder prosecution where defendant was charged with the killing of a police officer as distinguished from felony murder.
We are concerned here with the State's legitimate interest in telling a rational and coherent story of what happened to Amanda Joy Neal. What happened to Bobby Neal and Melanie Sue Polk is integrally intertwined with what happened to Amanda Joy. There was no error in the trial court's allowing this evidence to be presented to the jury.
Turning specifically to the confession of Howard Neal, if references to Bobby Neal and Melanie Sue Polk were required to be excised, the confession would be incoherent and, from the standpoint of the interest of justice, arguably unworthy of belief. As the trial judge noted, if evidence of other crimes had been left out of the defendant's confession, it would have been reduced to nonsense. If evidence of other crimes had not been admissible, Officer Stewart, when he detailed for the jury Neal's confession, would not have been a very credible witness.
Our careful study of the record in this case makes it clear that the trial judge and prosecuting attorney refrained from mentioning other crimes except when it was reasonably necessary to the State's legitimate effort to establish the capital murder of Amanda Joy Neal. Accordingly, under the authority of Johnson v. State and the other cases cited therein, this assignment of error is denied. See also, Davis v. State, 431 So.2d 468 (Miss. 1983); Beard v. State, 369 So.2d 769 (Miss. 1979); Gray v. State, 375 So.2d 994 (Miss. 1979); Herring v. State, 374 So.2d 784 (Miss. 1979).

VII.
Neal next complains that the trial court erred when it refused to suppress the in-court identification of him by Kenneth Hoffman. Neal claims that Hoffman's in-court identification was impermissibly tainted by his having been shown a photograph of Neal prior to trial. This it is said runs afoul of the familiar decision in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (conviction must be reversed where based on eye witness identification at trial if pre-trial photographic identification procedure was so impermissibly suggestive as to give rise to substantial likelihood of irreparable misidentification).
*760 Hoffman testified that he was manning the check-in desk at Della's Motel in Brookhaven, Mississippi, on January 24, 1981. Some ten days later two police officers presented him a photograph of a man and asked if he had ever seen the man before. Hoffman answered that he had. Upon checking his records, he found a registration card indicating that Neal had indeed been a guest at the motel on January 24, 1981.
Immediately prior to trial, Hoffman was again shown a photograph of the defendant. During the trial Hoffman identified Neal as having been at his motel on the morning of January 24, 1981, the day Amanda Joy Neal was murdered.
We regard the point as wholly meritless. Neal's conviction can hardly be said to have been based substantially on Hoffman's testimony. The only probative value of Hoffman's in-court identification was to establish that Neal was at the motel in the geographical environs of Lawrence County on the morning of the murders. The registration card was independent evidence establishing that fact. Moreover, Neal had admitted in his statement to Officer Wilson Stewart
That he got into Brookhaven on a Sunday morning, maybe about 6:00 o'clock in the morning, and he stopped at this little motel and left his wife there, and that he went on over to his brother, Bobby's place.
At trial, Hoffman testified that he based his identification of Neal partially on his independent recollection and partially on the photographs he had been shown by law enforcement officers. Even if this arguably tainted his identification under Neil v. Biggers, supra, there is no way Neal may be said to have been harmed unfairly. The fact of Neal's presence at the motel on the early morning hours of January 24, 1981, had been, as indicated above, clearly established by other evidence. Since Hoffman's in-court identification went no further, we reject this assignment of error.

VIII.
Finally, on the guilt phase of this trial Neal argues that he is entitled to a new trial because the verdict is against the overwhelming weight of the evidence. There is little precision in the way the point has been stated in the Brief for Appellant.
Following the verdict of the jury, Neal moved for a new trial. He necessarily invoked Rule 5.16 of our Uniform Criminal Rules of Circuit Court Practice which in pertinent part provides:
Rule 5.16
NEW TRIAL
The court on written notice of the defendant may grant a new trial on any of the following grounds:
(1) If required in the interests of justice;
(2) If the verdict is contrary to law or the weight of evidence;
The motion is necessarily addressed to the sound discretion of the trial judge. In this instance he denied the motion. We have authority to reverse only where we are convinced that the trial judge has abused his discretion. We are not so convinced.

IX.
For the reasons set forth above, the judgment of conviction of Howard Monteville Neal of the capital murder of Amanda Joy Neal pursuant to Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1983) is affirmed.

X.
Turning to the sentencing phase, Neal assigns as error the alleged impermissibly restrictive instruction given to the jury on mitigating circumstances. The instruction given itemized two elements of mitigation:
(1) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance [Miss. Code Ann. § 99-19-101(6)(b) (Supp. 1983)];

*761 (2) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired [Miss. Code Ann. § 99-19-101(6)(f)(Supp. 1983)].
Neal's point is that the instruction is defective because it fails to include a catchall "any other mitigating circumstances" clause.[11]
As authority for his position, Neal relies upon Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Washington v. Watkins, 655 F.2d 1346 (5th Cir., 1981).
Lockett holds that a capital sentencing jury may
"... not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964.
Lockett was reaffirmed in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
In Washington v. Watkins, supra, the United States Court of Appeals for the Fifth Circuit considered an instruction legally identical to that under consideration here. In fact, the Washington instruction is for all practical purposes verbatim the same as the one we have before us here. The Washington court held that the instruction, fairly read "operated affirmatively to preclude jury consideration of non-statutory mitigating factors". 655 F.2d at 1377. For that reason, the sentence of death which had there been imposed was vacated and the matter was remanded for a new trial on the issue of sentence only. Washington v. Watkins thus seems to require a similar result here. But see, Moore v. Zant, 722 F.2d 640, 646-647 (11th Cir.1983); and Corn v. Zant, 708 F.2d 549, 558-559 (11th Cir.1983).
Neal's argument here overlooks an elementary premise underlying the granting of jury instructions generally. Before an instruction may be granted, there must be in the record an evidentiary basis for it. See, e.g., Johnson v. State, 416 So.2d 383, 388 (Miss. 1982); Dunaway v. State, 157 Miss. 615, 617, 128 So. 770 (1930). We thus look to see whether there is in this record an evidentiary basis for an "any other mitigating circumstances" instruction.
In his brief, Neal's counsel itemizes the following "compelling mercy-evoking factors" he says the jury should have been allowed to consider.
"The appellant's [Neal] difficult and troubled childhood, his institutionalization at age 10 at the State school at Ellisville because of his learning difficulties and family difficulties, the lack of love and supervision during his early life (when he and his siblings were put up for adoption, the siblings were adopted, but no one would adopt appellant), the fact that he had a five-year-old daughter, the fact that he is so retarded that he is in the lower one percent of the population in intelligence with the mental ability of an 8-year-old child, and the fact that he suffers from an abnormal functioning of his brain which he is powerless to control."
With the possible exception of the fact that he has a five-year-old daughter, all of the above factors, considered singularly or together, relate to the two factors the Court instructed the jury to consider in mitigation. The ultimate factual conclusion which may reasonably be drawn from the evidentiary facts itemized by Neal's counsel would be either that the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, or that the capacity of *762 the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, or both. Neal's point thus reduces itself to a claim that, because he had a five-year-old daughter, he was entitled to the "any other mitigating circumstances" instruction. That fact, in our view, is simply not a substantial evidentiary basis warranting the instruction Neal here urges should have been given. The assignment of error is rejected.

XI.
Neal next argues that the prosecuting attorney in final argument to the jury became emotional and overly zealous and made a highly inflammatory argument. This, we are told, has resulted in his sentence of death being imposed under the influence of passion, prejudice and arbitrary factors. We are urged to vacate the sentence of death by virtue of Miss. Code Ann. § 99-19-105(3)(a) which does indeed vest in us the authority to vacate a death sentence when we determine that it has been "imposed under the influence of passion, prejudice or any other arbitrary factor".
We have carefully reviewed the final argument offered by the prosecuting attorney. Great latitude was indeed taken, but, in our view, not inappropriately so. The defendant is entitled to broad latitude in framing his final argument to the jury. See, e.g., Gray v. State, 351 So.2d 1342, 1346-1347 (Miss. 1977); Johnson v. State, 416 So.2d 383, 391-392 (Miss. 1982). The prosecuting attorney is entitled to a comparable latitude, so long as he or she does not argue some impermissible factor.[12] We reject this assignment of error.

XII.
Finally, we are presented with the argument that Neal may not constitutionally be sentenced to die because of his mental impairments. Our attention is called to Edwards v. State, 441 So.2d 84 (Miss. 1983), wherein we vacated a death sentence and remanded for imposition of a life sentence, three justices being of the opinion that because of Edwards' severe mental illness, "barbarism would attend our affirming the death penalty". 441 So.2d at 93.
The evidence regarding Neal's mental deficiencies has been recited above and need not be repeated here. When we compare Neal with Hezekiah Edwards, a person with "a long history of suffering from the mental disease schizophrenia of a paranoid type" 441 So.2d at 93, the difference is qualitative. Neal's emotional or mental disturbances are not nearly so severe as Edwards'.
Neal in effect argues that the State of Mississippi is constitutionally proscribed from imposition of the sentence of death upon one suffering from mental disabilities and impairment. That is simply not the law. The legislature of this State has within its lawful powers declared that mental or emotional disturbance or cognitive or volitional deficiencies may be mitigating circumstances. Miss. Code Ann. § 99-19-101(2), (6). But in doing this, our legislature has provided that mental disability is only one mitigating circumstance, to be considered together with other mitigating circumstances, and to be balanced and weighed against the aggravating circumstances, according to the procedure elaborated in §§ 99-19-101 et seq., generally. If its discretion is guided by otherwise proper instructions, the jury has been empowered by law to find that the aggravating circumstance or circumstances proved outweigh this (and other) mitigating circumstances and that the defendant should suffer the penalty of death.
*763 As indicated above, we have held the jury instructions at the sentencing phase proper. After receiving the evidence at sentencing and the instructions of the Court and arguments of counsel, the jury returned the following verdict:
"We, the jury, unanimously find that the aggravating circumstance(s) of:
(1) the capital murder was committed while the defendant was engaged in the crime of kidnapping or attempted kidnapping,
(2) the defendant committed the capital murder in an especially henious, atrocious or cruel manner,
is sufficient to impose the death penalty (and) that there are not sufficient mitigating circumstances to outweight the aggravating circumstances, and we unanimously find that the defendant should suffer death".
This sentence was within the jury's power. Following receipt of this sentence, it was the duty of the trial court to impose the sentence of death. Upon this appeal, it becomes our duty to affirm.

XIII.
Independent of the assignments of error, we have the obligation to review the sentence to determine
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's ... finding of a statutory aggravating circumstance enumerated in § 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Miss. Code Ann. § 99-19-105(3) (Supp. 1983).
Having performed that statutorily mandated sentencing review, we state our firm conviction that the sentence of death imposed here was not impermissibly influenced by passion, prejudice or any other arbitrary factor. For the reasons articulated in section V above, the evidence supports the jury's finding of the statutory aggravating circumstance of kidnapping. In addition, it is our considered view that the evidence supports the jury's finding that the offense was committed in an especially heinous, atrocious or cruel manner.
We have reviewed the sentence of death here and compared it with those imposed in other similar cases.[13] While such comparison is necessarily subjective and imprecise, we cannot say that the sentence of death imposed here is excessive or disproportionate to the penalty imposed in other similar cases, considering both the crime and the defendant.
Accordingly, the judgment of the Circuit Court of Lawrence County, Mississippi, sitting via change of venue in Lamar County, that Howard Monteville Neal suffer death under the authority of Miss. Code Ann. §§ 97-3-21 and 99-19-101 et seq. (Supp. *764 1983), should be and the same is hereby affirmed. Wednesday, July 11, 1984, is hereby fixed as the date of execution of the sentence and infliction of the penalty of death upon the said Howard Monteville Neal in the manner prescribed by law.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, DAN M. LEE, and PRATHER, JJ., concur.
HAWKINS, J., dissents.
PATTERSON, C.J., and SULLIVAN, J., not participating.
HAWKINS, Justice, concurring in part and dissenting in part:
I concur the confession was admissible, but not because Neal "understood the content and substance of the Miranda warnings", i.e. his right not to incriminate himself under the 5th Amendment and his right to legal counsel under the 6th Amendment to the United States Constitution. I am incapable of believing this retarded person was capable of understanding these two provisions of the United States Constitution.
I respectfully dissent on this Court's affirming the death penalty.
For the reasons expressed in my dissent in Booker v. State, 449 So.2d 209 (1984), I think the defendant in this case was entitled to have the jury instructed that in addition to the mitigating circumstances set out, the jury was authorized to consider "any other facts which you find from the evidence reasonably mitigates against imposition of the death penalty".
Further, under the responsibility imposed upon this Court by Miss. Code Ann. § 99-19-105 (1977) I would terminate this case and any further expense attendant to a death penalty case by remand to the circuit court for modification to a mandatory sentence of life imprisonment. See Edwards v. State, 441 So.2d 84 (Miss. 1983).
Neal is a 30-year-old man who has been permanently condemned with the mind of a 7- to 10-year-old child.
Placed as a child in the state institution for feeble-minded children, he graduated to Whitfield State Mental Hospital, another State institution.
Probably he should have never been released from a state institution except, if at all, under carefully controlled circumstances.
He has committed three brutal, absolutely senseless killings, plainly the result of a deformed and deranged brain, and not simply a criminal mind.
Does this man deserve the worst sentence which we as a society are authorized to inflict? We could exact no more severe penalty on a Stalin, a Hitler, the superintendent of Buchenwald, or some cold-blooded hired killer.
I do not challenge the need to incarcerate Neal. From his deed one can only wonder why he was ever permitted loose upon society in the first place. Were his dangerous propensities never discovered in all those years at the state mental institution? Society must be protected from individuals such as this, and it is miserably poor economy to contend the state lacks the funds to keep them in custody.[1]
This case should be terminated, in my view, as it should have been handled in the trial court, with consecutive sentences to life imprisonment. Thousands of dollars in taxpayers' expense would thereby be saved.
*765 To me this is common sense, aside from compassion. Nature has already treated Neal cruelly. Must we as a State also kill him? Putting him in the penitentiary for life is not enough punishment?
Surely, our perception of justice is impaired if in the imposition of the death penalty we can perceive no distinction between Neal's and other murders.
We are not the trial court, confronted with the passion and outrage of the local citizens, but the high Court in this State. Under Miss. Code Ann. § 99-19-105 (1977), the Legislature has imposed upon us the duty to reduce a death penalty to life imprisonment when we feel the case warrants it.
In my respectful view, this is such a case.
NOTES
[1] We refer here, of course, to the warnings required to be given under Miranda v. Arizona, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1629-1630, 16 L.Ed.2d 694, 726 (1966).
[2] That Neal I.Q. tested out at 54, properly construed, means that his true intelligence quotient lies between 49 and 59. According to the Diagnostic and Statistical Manual of Mental Disorders (3rd Ed. 1980), published by the American Psychiatric Association (hereinafter "DSM-III"),

"Since any measurement is fallible, an I.Q. score is generally thought to involve an error of measurement of approximately five points hence, an I.Q. of 70 is considered to represent a band or zone of 65 to 75."
[3] Mild mental retardation is the classification given to persons who score between 50 and 70 on the Wechsler Adult Intelligence Scale. It has been described in DSM-III as follows:

Mild mental retardation is roughly equivalent to the educational category "educable." This group makes up the largest segment of those with the disorder  about 80%. Individuals with this level of mental retardation can develop social and communication skills during the pre-school period (ages 0-5), having minimal impairment and sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can learn academic skills up to approximately the sixth grade level; and during the adult years, they can usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress.
DSM-III, page 39.
[4] Dr. Stanley's test would suggest that Neal's true I.Q. was somewhere between 55 and 65. See footnote 2, supra.
[5] Neal's interrogation took place in Stockton, California. Rights secured under the Constitution and laws of the State of Mississippi nevertheless become applicable when he is prosecuted in this State. Stockton Detective Sgt. Wilson Stewart was acting at the instance of Lawrence County, Mississippi law enforcement officials in his interrogation of Neal. He was investigating a crime that had occurred in Mississippi and was subject to prosecution only in Mississippi. The confession secured was sought to be offered as evidence at Neal's trial in this State. We do not know what relevance the constitution and laws of the state of California may have had if Neal had been prosecuted elsewhere. We hold that in the instant Mississippi prosecution Neal may invoke all rights secured to him by the Constitution and laws of this state, in addition, of course, to those rights secured by the Constitution of the United States, even with respect to the admissibility of the confession Neal gave in California.
[6] Bradshaw concerns a waiver of the right to counsel. We are here concerned with Neal's waiver of his privilege against self-incrimination. In the present context the two issues are sufficiently intertwined, de jure as well as de facto, that we regard Bradshaw as authority for holding admissible Neal's confession.
[7] See generally, Annotation, Mental Subnormality as Affecting Voluntariness or Admissibility of a Confession, 8 A.L.R. 4th 16 (1981).
[8] A per se involuntariness finding may be appropriate in the case of moderate or severe retardation. It clearly is not appropriate where, as here, the individual is mildly mentally retarded.
[9] The role of jury instructions is important to appellate consideration of an issue such as that tendered here. Just as the State must prove each element of the offense, the jury must be correctly and fully instructed regarding each element of the offense charged. See, e.g., Martin v. State, 163 Miss. 454, 458, 142 So. 15, 16 (1932); Ellis v. State, 33 So.2d 838, 839 (Miss. 1948). See also, Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495, 1506 (1945). Here the Court was required to instruct just as fully regarding the definition of kidnapping as it was on murder. When reviewing the record to determine whether a hypothetical reasonable juror may under our familiar test have voted to convict, we must know what the jury knew about the law. Where the jury had incorrect or incomplete instructions regarding the law, our review task is nigh unto impossible and reversal is generally required.
[10] We observe that the State, for whatever reason, unnecessarily restricted itself in the definition of kidnapping that it requested be submitted to the jury. Kidnapping is defined in our statutes as follows:

Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such other person to be secretly confined or imprisoned against his or her will, ... .
Miss. Code Ann. § 97-3-53 (Supp. 1983).
For whatever reason, the State's instruction failed to submit the concept of inveigling to the jury. Cf. Wilcher v. State, 448 So.2d 927, 935 (Miss. 1984).
[11] The use of such non-limiting "any other mitigating circumstances" instructions has been approved by this Court in Gray v. State, 375 So.2d 994, 1003-1004 (Miss. 1979) (approving instruction that jury was to consider as a mitigating circumstance "[a]ny other matter [besides the statutory mitigating circumstances] brought before you which you may deem to be mitigating on behalf of the defendant"). As a matter of practice, such language should be employed in every case to avoid this troublesome point arising in the future.
[12] For example, our cases have held that the prosecuting attorney may not in final argument comment upon the fact that the defendant failed to take the stand and testify in his own behalf. See, e.g., Wilson v. State, 433 So.2d 1142, 1145-1146 (Miss. 1983). In addition, in capital murder trials, we have held that the prosecuting attorney at sentencing may not comment upon appellate review, Wiley v. State, 449 So.2d 756, 761 (Miss. 1983) or the possibility of parole, Williams v. State, 445 So.2d 798, 812-814 (Miss. 1984).
[13] The cases we have considered and compared with the case at bar include:

DEATH PENALTY CASES AFFIRMED BY THIS COURT:
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978), and 441 So.2d 846 (Miss. 1983).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT.
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).
[1] This is an excellent case for a study of our state mental institutions to determine (1) Why is it that dangerous individuals are discharged upon society? (2) What safeguards are given towards informing the family and law enforcement officers when a potentially dangerous person is discharged?

This case involved a mentally warped person and his close kin. It would appear that if they had been given any warning at all he could be dangerous, this tragedy may well have been avoided.
Simply putting Neal away now should not end the inquiry. Rather, it should begin an investigation by appropriate state officials of why this tragedy had to happen. Other similar tragedies may thus be prevented.