While I concur unreservedly in the result, I am disturbed by the majority's reasoning regarding King's counsel's obligation, or lack thereof, to have King's intelligence quotient (IQ) established prior to the sentencing phase of his trial. It is inconceivable to me that counsel, perceiving that his client in a capital murder prosecution was "slow" or "dull", as is conceded in this case, would enter the sentencing phase without having had his client IQ tested, unless and only unless he was without the means, monetary and otherwise, to get the necessary testing done.
I make my point in the context of our law's recognition that one convicted of a capital crime may at his sentencing trial establish in mitigation
 (b) the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 * * * * * *
 (e) the defendant acted under extreme duress or under the substantial domination of another person;
 (f) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Miss. Code Ann. § 99-19-101(6) (Supp. 1986). Beyond these statutory factors, the defendant is entitled to show any other circumstance which might militate against imposition of the death penalty. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 990 (1978); Neal v. State, 451 So.2d 743, 761 (Miss. 1984).
In this state of our law it has become the accepted and almost routine practice of defense counsel in capital murder cases to obtain an IQ test of the accused prior to the sentencing phase. This is for the obvious reason that the defendant's general level of intellectual functioning is quite relevant to the several potential mitigating circumstances just enumerated.
To be sure, there are and will be some persons accused of capital crimes who will be so obviously at the normal or above range of intelligence that counsel might not be faulted for failure to procure an IQ test. But when counsel's senses tell him that his client is slow or dull, the IQ test should be automatic. Where the means are available to obtain the test, it should no more be pretermitted by competent counsel than a physician would examine a patient and not take his temperature or blood pressure.
I take exception to the suggestion in the majority opinion that, since counsel did not know of his client's intelligence level, he cannot be criticized for his failure to find out. Where counsel's senses tell him there is a reasonable possibility of subnormal intellectual functioning, it is counsel's duty to find out. Perhaps there was a time in the early days of the bifurcated capital murder trial — and this may well include the present case which was tried in 1981 — when counsel might not be faulted in this regard. That day has passed.[1]
I would reject the assignment of error under consideration solely on grounds of lack of prejudice. The evidence reflects *Page 277 
that King has an IQ of 71.[2] This is a far cry from the situation in Jones v. Thigpen, 788 F.2d 1101 (5th Cir. 1986) where counsel failed to investigate his client's IQ and the evidence reflected that he had an IQ of somewhere between 41 and 53.
[1] I also regard as a near "automatic" requisite for proper preparation for a sentencing phase of a capital murder trial the administration to the defendant of the Minnesoto Multiphasic Personality Inventory (MMPI), or some like diagnostic tool.
[2] That King had an IQ test result of 71 suggests that his true IQ is somewhere between 66 and 76.
. . . [S]ub average intellectual functioning is defined as an IQ of 70 or below on an individually administered IQ test. Since any measurement is fallible, an IQ score is generally though to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75.
American Psychiatric Association, Diagnostic and StatisticalManual of Mental Disorders 36 (3d ed. 1980) ("DSM-III").