566 So.2d 1256 (1990)
William Wayne WHITE
v.
STATE of Mississippi.
No. 07-KA-59157.
Supreme Court of Mississippi.
August 29, 1990.
*1257 George M. Mitchell, Jr., C.P. Fortner, Jr., Fortner & Mitchell, Eupora, for appellant.
Mike C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and ANDERSON, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
William Wayne White was indicted, tried and convicted in the Circuit Court of Webster County on a charge of murder. The presiding judge, Honorable Clarence E. Morgan, Jr., sentenced White to life in the custody of the Mississippi Department of Corrections. White has appealed to this Court and presents six issues for determination.

FACTS
On Monday, July 21, 1988, at approximately 1:00 p.m., Leonard Fisher went to the home of Thomas Neal. He opened the screen door to Neal's home and knocked on the door. When he received no answer, Fisher opened the door and saw Neal's body lying on the floor with the head in a puddle of blood. Fisher went to a nearby store and requested the storekeeper to notify the sheriff.
Sheriff Bill Middleton, accompanied by the county coroner drove to the Neal residence in the Montevista community of Webster County where they determined that Neal was dead. They noted the condition of the body and the room, and conducted a preliminary investigation. Sheriff Middleton contacted the Crime Lab in Jackson and obtained the services of lab technicians and two crime investigators.
The officers observed three bullet wounds on the body, one on the forehead, one on the back of the skull, and one in the back of the neck. They found four 25-caliber automatic shell casings on the floor. A subsequent autopsy on the body revealed that one bullet entered the forehead and ranged front to back; one entered the back of the skull and ranged from back to front, horizontal with the floor; and one entered the back of the neck and ranged through Neal's left lung and entered his heart. The wound to the neck had burn marks on the skin, indicating that the muzzle of the gun was in "near contact" when fired, i.e., a distance of eighteen (18) to twenty-four (24) inches. The other two wounds were not classified as contact wounds or near contact wounds and they were fired from a distance. According to the pathologist, each wound was sufficient to cause the death of Neal.
On July 21, 1988, Sheriff Middleton and Officers Billy Gore and Larry Butler of the Mississippi Highway Patrol, went to the residence of the appellant. When asked whether he had a 25-caliber automatic pistol, appellant stated that he had one but had lost it or someone had stolen it in the last couple of days. Inquiry was made as to whether or not appellant had been to Neal's house on July 19. Appellant admitted that he had and that he also had been to the homes of Nancy Helms and Tommy Brown the same night. The sheriff arrested appellant and confined him in the Webster County jail.
The officers contacted Nancy Helms and she testified at trial that the appellant came to her house around 7:00 p.m. and stayed until about 8:30 p.m. during which time he ate supper; that she told appellant Neal had been to her house and the appellant stated that he was going to kill Neal; and that appellant had been drinking and she thought he was joking.
After questioning Nancy Helms, the officers returned to the Webster County Jail and questioned appellant. Sheriff Middleton testified about that conversation as follows:
Q: Now, did the Defendant actually  did you actually ask the Defendant any questions at the jail and did he actually answer those questions?
A: Yes, sir, I asked him questions at the jail about if he understood his rights and he said he did and I asked him if he'd talk to us about the Thomas Neal killing up there and he finally said that he  he hesitated a little bit and he said, "Bill, *1258 you knew all the time that I killed him, didn't you?" I said, "Well, I felt like you did." And, he just looked at me and said that, and I said, "Wayne, what happened?" And, he said "Well, we got in an argument. I went by his house and we got in an argument about some dogs. He was talking about hunting." And, he said, "He told me he was going to whip my ass and I wasn't going to let him do that. So, I got out of my vehicle " He said, when he got out of his vehicle, he had his  I said, "Where was your pistol? He said "When I got out of my vehicle, I put my pistol in my right front pocket and went in the house and set [sic] down on the couch." And, he said, "When he told me he was going to whip me, well, I got up and started shooting, and I was  I guess I hit him in the head several times." said, "That's where I was shooting for." And, he said, "Wasn't he hit in the head?" And, I said, "Yeah, he was." And, I asked him where the weapon was and he said that I could get  go talk to his mother and daddy and get the weapon. That's what he told us, and said we could go talk to them and get the weapon. And, we did.
Q: Now, Sheriff, it's unclear in my mind. What reason, if any, did the Defendant give you for shooting Thomas Neal when you talked to him at the Sheriff's office?
A: Only reason that he told us was that they got in an argument about some dogs and he said Thomas Neal told him he was going to whip his ass  that's his exact words  and he said, "I wasn't going to let him do that." And, said, "I come out with my pistol" And, said "I started shooting." And, said, "I was aiming for his head." Said, "I shot several times." And, said, "That's where I should have hit him." And, asked me if that's where he was hit and I told him it was.
After conferring with the appellant and returning him to his jail cell, Sheriff Middleton went to the home of appellant's parents and recovered the 25 caliber automatic pistol wrapped in tinfoil from a hole in the hall of a barn. Steve Byrd, a forensic scientist with the Mississippi Crime Laboratory, testified that the projectiles and casings recovered from Neal's house were fired from the pistol found in the barn. The officer's investigation further revealed that Neal was approximately 5'9" tall and weighed approximately 250 pounds. At the time of his death, Neal's blood alcohol level was .21. Appellant testified in his own behalf and stated that he was forty-four (44) years old, 5'4" tall and weighed approximately 150 pounds; that, on the day of the shooting, he went by Nancy Helms' house about 7:30 p.m.; that he ate supper with her and left about 8:30 p.m. and went to Tony Brown's house where he stayed until about 9:30 p.m.; that he decided to stop by Neal's house for a "friendly talk". He denied making any statements to Nancy Helms about Neal; and denied that he had his pistol in his pocket when he stopped at Neal's house.
Appellant further testified that Neal was drinking heavily when he saw him at his home; that Neal cursed him and threatened to kill him, and grabbed him by the throat and started choking the appellant; that appellant reached in his hip pocket, got his pistol and shot Neal until he turned him loose; that he shot Neal the first time in the back of the neck while Neal was choking him; that Neal did not fall and kept holding him and that he shot him again in the back of the head; that Neal staggered back but still grabbed for him and he shot Neal between the eyes, whereupon Neal went backwards and fell. Appellant claimed self-defense in the shooting.

LAW

I.

DID THE LOWER COURT ERR IN FAILING TO GRANT WHITE'S MOTION FOR A DIRECTED VERDICT OF MANSLAUGHTER AT THE CLOSE OF THE STATE'S CASE and DID THE LOWER COURT ERR IN FAILING TO GRANT WHITE'S MOTION FOR A DIRECTED VERDICT AS TO NO GREATER CHARGE THAN MANSLAUGHTER *1259 AT THE CONCLUSION OF THE APPELLANT'S CASE?
After resting his case, the appellant moved for a directed verdict on the charge of murder, contending that the evidence only rose to that of a potential charge of manslaughter. The lower court made the following ruling on the motion:
BY THE COURT: But, his own testimony is there was no question that they were not in a fight or a scuffle, in that sense. His testimony is he was defending himself, and it's either a question of whether he shot this man in self-defense or whether he was not in self-defense. There's no question of manslaughter  no issue of manslaughter in this case. He didn't kill him in heat of passion. He killed him in self-defense. That's what he claimed. Therefore, it's just  that charge just does not lie on these facts, and the motion is overruled. And, that is going to go to the instructions, too, unless something develops between now and then. It's just not a manslaughter case. Either he was justified in killing him or he wasn't.
Notwithstanding the strong language used by the trial judge in ruling on this issue, he submitted to the jury the issue of manslaughter in instruction S-3, instruction S-6 and instruction S-7. The lower court also submitted the issues of murder and self-defense. The jury was thoroughly instructed as to the theories of the state and the appellant.
The lower court correctly denied the motion for a directed verdict on the issue of murder and the motion to limit the prosecution to the issue of manslaughter. The rule has been stated countless times as follows:
The standard of review in judging the sufficiency of the evidence on motion for directed verdict requires that we accept as true all evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such evidence would support a verdict of guilty beyond a reasonable doubt, the trial court's denial of the motion must be affirmed.
Boyd v. State, 523 So.2d 1037, 1040 (Miss. 1988); Stever v. State, 503 So.2d 227, 230 (Miss. 1987); Haymond v. State, 478 So.2d 297, 299 (Miss. 1985); Warn v. State, 349 So.2d 1055 (Miss. 1977).
The issue number one is rejected.

II.

DID THE LOWER COURT ERR IN ALLOWING THE PROSECUTION TO PUT ON REBUTTAL WITNESS MILDRED SMITH?
The prosecutor called in rebuttal the witness, Mildred Smith, over the objection of the appellant. When the appellant testified, he stated that the victim was choking him, which was the first information the prosecutor had of that contention. The lower court ruled Ms. Smith could testify and she stated that Neal had arthritis in both hands; that he had little use of his hands; and that she had never seen Neal when his hands were not drawn.
The appellant contends that Ms. Smith's testimony should have been excluded, because her name was not furnished as a possible witness. The Uniform Criminal Rules of Circuit Court Practice 4.06 only requires disclosure of the witnesses used by the prosecution in its case-in-chief. Smith was clearly a rebuttal witness. Therefore, the prosecution was not required to disclose her identify under Rule 4.06. Shavers v. State, 455 So.2d 1299, 1301 (Miss. 1984); Thomas v. State, 377 So.2d 593 (Miss. 1979). Rule 4.07 requires disclosure of rebuttal witnesses when the defendant plans to use the defense of alibi. Such rule is not applicable on this issue.
The issue number two is rejected.

III.

DID THE PROSECUTION FAIL TO TIMELY PROVIDE PROPER DISCOVERY BY NOT PROVIDING THE APPELLANT THE NAME OF A KEY PROSECUTION WITNESS UNTIL SIX (6) DAYS PRIOR TO TRIAL?
*1260 The appellant contends that the prosecution violated Uniform Criminal Rules of Circuit Court Practice 4.06 by failing to notify defense attorneys that Nancy Helms would be called as a witness until six days prior to the trial. However, the defense counsel did not express dissatisfaction with the state's disclosure of Nancy Helms prior to trial, or at the trial, and did not raise the issue in the lower court. Further, the record reflects from his own investigation of the case, defense counsel learned that the appellant stopped by Nancy Helms' house on the evening of the shooting; that he interviewed her prior to trial and she told him of the appellant's statement he was going to kill Neal; that defense counsel's cross-examination of Nancy Helms reveals that he had a "good" talk with her the week prior to trial; that he conducted an active and thorough cross-examination of her on the events of July 19, 1987; and that defense counsel knew of Nancy Helms and her statement long before trial.
The issue number three is rejected.

IV.

WAS THE JURY VERDICT CONTRARY TO THE WEIGHT OF THE EVIDENCE?
The discussion as to issue number one covers and applies to issue number four and it is without merit.
Issue number four is rejected.

V.

SHOULD THE LOWER COURT HAVE GRANTED THE APPELLANT'S MOTION FOR JNOV OR NEW TRIAL BECAUSE THE JURY WAS NOT KEPT PROPERLY SEQUESTERED?
The appellant contends that the jury, which was ordered to be sequestered by the court without a motion from either party, was allowed to roam over the grounds of the courtyard and have contact with persons who were not on the jury panel. On March 10, 1988, a hearing was held on the appellant's motion in which ten members of the jury testified. In addition, two bailiffs, who attended the jury, and one Judy Stroud, a relative of the appellant, testified.
After hearing one day of testimony on January 19, 1988, the jury spent the night in a motel in Mathiston, Mississippi. They were attended by two bailiffs, Thomas Crowe, and Sue Mitchell. Appellant's complaint centers around events the following morning after the jury arrived at the courthouse and while they were putting luggage in their cars before entering the jury room. Appellant contends that the jury was improperly sequestered; that some members of the jury were separated from others; that many did not know where the other jurors were at times; that Juror Bland conversed with his daughter; and that Mrs. Boatman was separated from the jury for a period of time while she was in the clerk's office. The appellant cites Grimsley v. State, 212 Miss. 229, 54 So.2d 277 (1951), which is distinguished from the case-at-bar.
The appellant argues that the members of the jury were scattered and totally unsupervised and commingled with others, when they exited the bus to put their clothes in their respective vehicles. On the contrary, the record indicates that the bailiffs kept the jury members together and stayed with them; that no juror testified he or she was alone or out of sight of the bailiff; that all ten jurors denied that any outsider attempted to, or did, talk to them about the case or attempted to influence them about the case; that all the jurors entered the courthouse together and went to the jury room together.
The appellant makes two specific allegations of misconduct, i.e., 1) that Juror Bland's daughter briefly spoke to him while getting his luggage on the morning of July 20; and 2) that Judy Stroud saw Boatman exit the Circuit Clerk's office unaccompanied by anyone. The record clearly indicates that Mr. Bland was an elderly man and by his own admission did speak to his daughter on the morning of July 20; that his daughter had come to take his luggage to the car; that while she was taking the luggage, he asked about his wife's health because she had been sick. *1261 Bailiff Thomas Crowe testified that he was standing at Mr. Bland's side while Mr. Bland and his daughter were talking and that he could hear everything they said; that they did not discuss the case; that they talked about medicine. Sandra Corbin, a juror, confirmed that Bailiff Crowe was with Mr. Bland during the discussion and stated that she overheard the conversation and nothing about the case was discussed.
The second specific allegation of misconduct came from appellant's sister, Judy Stroud. She testified that she saw Juror Boatman come out of the Circuit Clerk's office unaccompanied by anyone. When Mrs. Boatman was on the stand, prior to Stroud's testimony, the defense attorney did not ask her about the incident and after Mrs. Stroud testified, the defense attorney did not call Mrs. Boatman back to the stand and ask her about the incident. No other juror or bailiff testified to her absence nor were they asked.
Applying our standard of review to the findings of fact made by the court, we are of the opinion that the lower court did not err in overruling the motion for a new trial. Carter v. State, 493 So.2d 327 (Miss. 1986); Neal v. State, 451 So.2d 743, 753 (Miss. 1984); Anderson v. State, 231 Miss. 352, 95 So.2d 465 (1957).
The issue number five is rejected.
There being no reversible error in the trial below, the judgment of the lower court is affirmed.
CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.