5 So.3d 411 (2008)
Anthony Terrell BOOKER a/k/a Robert Booker, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-02143-COA.
Court of Appeals of Mississippi.
January 29, 2008.
*415 Ross Parker Simons, attorney for appellant.
Office of the Attorney General, by W. Daniel Hinchcliff, attorney for appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
ROBERTS, J., for the Court.
¶ 1. The motion for rehearing is denied. The original opinion is withdrawn, and this modified opinion is substituted in lieu of our previous opinion.
¶ 2. Anthony Terrell Booker was arrested on January 6, 2003, for the murder of Dorian Johnson. He was indicted on October 9, 2003 by the Jackson County grand jury for capital murder. Convicted in a jury trial, which commenced on May 17, 2004, Booker was sentenced to life imprisonment without the possibility of parole. Aggrieved, Booker appeals and asserts the following issues, which we quote verbatim:
1. BARELY SIXTEEN YEARS [OLD] AT THE TIME OF THE CRIME HE WAS CHARGED WITH, AND LIKELY RETARDED, MR. BOOKER WAS DENIED CONSIDERATION FOR A TRANSFER HEARING TO YOUTH COURT. THE STATUTES PERMIT IT AND IT WAS ERROR UNDER GARY V. STATE FOR THIS OPTION NOT TO BE CONSIDERED;
2. THE PROSECUTORS BLATANTLY VIOLATED BATSON BY MISREPRESENTING FACTS TO THE *416 COURT AND WHEN THE TRIAL COURT WAS MADE AWARE OF THIS IT ERRED IN NOT GRANTING MR. BOOKER A NEW TRIAL;
3. MR. BOOKER WAS DENIED HIS RIGHT TO A SPEEDY TRIAL UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS;
4. THE TRIAL COURT ERRED IN DENYING MR. BOOKER'S MOTION TO SUPPRESS HIS STATEMENT AS IT WAS SECURED IN VIOLATION OF THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS;
5. THE TRIAL COURT ERRED IN PERMITTING DR. MCGARRY TO RENDER IRRELEVANT AND HIGHLY PREJUDICIAL OPINIONS OUTSIDE HIS EXPERTISE AND NOT TENDERED IN DISCOVERY, THIS DESPITE A COURT ORDER SPECIFICALLY DESIGNED TO PREVENT THIS EVIDENTIARY BREACH;
6. THE TRIAL COURT ERRED IN ADMITTING THE PHOTOGRAPHS IN STATE'S EXHIBITS EIGHT AND NINE; AND
7. MR. BOOKER'S JURY WAS NOT SWORN WITH THE CAPITAL PETIT JURORS OATH AND HIS VERDICT IS UNLAWFUL AND UNCONSTITUTIONAL AS PER MISSISSIPPI SUPREME COURT DECISIONS.
Finding no error, we affirm.

FACTS
¶ 3. On December 30, 2002, Booker, Shawn Davis, Mary Scarbough, and Desmond Shields were involved in the beating death of Dorian Johnson. At the urging of Scarbrough, Booker, Davis, and Scarbrough met Johnson at a park where they began beating and kicking him. After the beating, the trio placed Johnson in the back of his Jeep and transported him to Vancleave. There the trio, now joined by Shields, continued the beating and took Johnson's Jeep and wallet. After being reported missing by his family, Johnson was found in Vancleave on January 6, 2003. Johnson's principal cause of death was determined to be severe blunt injuries to the head, although contributing causes included several severe cuts to his face and neck, broken ribs, and fluid buildup in his lungs. Booker, Davis, Scarbrough, and Shields were arrested on January 6, 2003, and charged with Johnson's death. After filing a motion for severance on March 4, 2004, Booker was tried for his crime on May 17, 2004, and convicted and sentenced on May 20, 2004.

DISCUSSION

1. Whether the trial court erred in not transferring Booker's case.
¶ 4. Booker was sixteen years old at the time of Johnson's death and his indictment for capital murder. Booker was seventeen years old when convicted of capital murder. Booker claims that because he had not reached the age of majority, had a low IQ score, and did not use a firearm in Johnson's murder, his case should have been transferred to youth court. However, Booker's trial counsel failed to raise this issue before the trial court. A trial judge cannot be held in error for an issue that has not been presented to him for a decision at the trial level. Milano v. State, 790 So.2d 179, 189(¶ 47) (Miss.2001) (citing Howard v. State, 507 So.2d 58, 63 (Miss.1987)). The appellate courts of Mississippi have no original jurisdiction and can only hear questions tried and passed on by the court from which the appeal has been taken. Id. (citing Patterson v. State, 594 So.2d 606, 609 (Miss.1992)). For this reason, this issue is not properly before this Court.
*417 ¶ 5. Even if the issue was not procedurally barred, it is without merit. Pursuant to Mississippi Code Annotated Section 43-21-151(1)(a) (Rev.2004), the circuit court has original jurisdiction over a child charged with capital murder. That section reads:
(1) The youth court shall have exclusive jurisdiction in all proceedings concerning a delinquent child, a child in need of supervision, a neglected child, an abused child or a dependent child except in the following circumstances:
(a) Any act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death, will be in the original jurisdiction of the circuit court.
¶ 6. Because the circuit court had original jurisdiction over Booker, it was not required to consider alternative sentencing. Flowers v. State, 805 So.2d 654, 659(¶ 14) (Miss.Ct.App.2002). Therefore, this issue is without merit.

2. Whether the trial court erred in permitting the prosecution's use of its peremptory strikes.
¶ 7. Booker, who is African American, claims that the trial court erred in accepting as race-neutral the reasons offered by the State for two of its four peremptory strikes against African-American on the venire. Pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a defendant must establish a prima facie case of purposeful discrimination by proving:
1. that the defendant is a member of a cognizable racial group;
2. that the prosecution exercised peremptory challenges to remove from the venire members because of the defendant's race; and
3. that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race.
Id. at 96, 106 S.Ct. 1712. Once the defendant has established a prima facie case of discrimination, the State must provide a race-neutral reason for each strike. Id. at 98, 106 S.Ct. 1712. The trial court then determines whether the defendant has established purposeful discrimination. Id.
¶ 8. Because four of the State's peremptory strikes were exercised against four of the five African American veniremen, the trial court found that Booker had established a prima facie case of discrimination, and ordered the State to offer race-neutral reasons for each of the strikes. The two strikes with which Booker finds particular fault are those against Jurors 14 and 20.
¶ 9. Regarding Juror 14, Chauncey Thompson, the facts are entirely undisputed. After Booker raised his Batson objection, the district attorney and the assistant district attorney offered purported non-pretextual race-neutral reasons for exercising a peremptory challenge on Thompson. To be specific, the exchange between the prosecution and the trial judge proceeded as follows:
[PROSECUTOR]: Judge, the first Batson challenge arises with Juror Number 14 Chauncey Thompson. The State's race neutral reason, Judge, is that, in checking the names of our jurors, we found that he has a marijuana conviction, a driver's licence violation, an insurance violation, a seat belt violation in Pascagoula. He was convicted on 2/5/03. And on those bases, especially the marijuana conviction, Judge, we didn't want a convicted marijuana holder on our jury.
....

*418 THE COURT: And that information was verified through what source?
[PROSECUTOR]: Through the Pascagoula City Court.
[DEFENSE ATTORNEY]: We'd like a copy of it. Judge, he's a 29-year-old black male that works at Sears, Roebuck and Company and has a college education, and they want to kick him off. He was born and raised in this county.
THE COURT: Well, I find that the existence of that prior criminal history is sufficiently race-neutral to justify a peremptory challenge, a peremptory strike.
[DEFENSE ATTORNEY]: Judge, I'd like to see it.
THE COURT: If that information is available, Mr. Jones?
[PROSECUTOR]: Yes, sir. It's a matter of record with the Pascagoula Municipal Court. His conviction date is February the 5th, 2003. You can go get it.
[DEFENSE ATTORNEY]: Well, I mean, I don't have access to the Pascagoula Police Department.
[DISTRICT ATTORNEY]: We just called, Your Honor. That's how we got it, over the telephone.
....
[PROSECUTOR]: And I assure you we're not making that up, Judge.
The trial court accepted the prosecution's representation as race-neutral and allowed the prosecution to strike Thompson from the jury.
¶ 10. On August 13, 2004, the trial court conducted a hearing on Booker's motion for a new trial. During that hearing, Booker, for the first time, produced an affidavit from Rhonda Diehl, the Pascagoula City Court Clerk. According to Diehl's affidavit, on the morning of May 17, 2004, she informed Investigator Scott McIlrath of the District Attorney's office that Thompson had been charged with the four misdemeanors, but Thompson had not been convicted of those four charges. Diehl indicated that she told McIlrath that those charges had been dismissed because Thompson was not the person who had committed the offenses.
¶ 11. Confronted with this fact during the hearing on Booker's motion for new trial, Anthony Lawrence, the district attorney, explained that, even had he been aware that the charges against Thompson had been dismissed, he still would have exercised a peremptory challenge against Thompson. Lawrence explained that Booker could have claimed misidentification as a defense, and if Booker had, he would not have wanted Thompson on the jury. Lawrence was of the opinion that Thompson, a victim of mistaken identity, would be sympathetic to Booker because Booker may claim misidentification as a defense. Lawrence also thought Thompson might harbor ill will against the prosecution.
¶ 12. The trial court found that Lawrence was not intentionally dishonest. The trial court stated:
In regard to the Batson challenges, I have not seen anything that would leave this Court to believe that the State of Mississippi at trial engaged in any conduct that would discriminate against the constitutional rights of a potential juror to serve as a juror in a criminal case here in the state of Mississippi. The reasons offered, I think  and I suppose, you know, there may be quibbling that we could do as to the particulars of each of those challenges, but the substance of the reason offered by the State of Mississippi at the time the challenge was made and the objection heard by the Court, the substance of those rulings I find to be substantiated by the affidavits and the exhibits that have been introduced here. You may quibble about the *419 details but I find no evident untruths or dishonesty at all involved on the part of the State of Mississippi. The reasons submitted are essentially the reasons that were given at trial to exclude these particular jurors.... But your subsequent investigation as evidenced by these affidavits that you've submitted as exhibits don't indicate to me any basis for believing, as you stated, that these were lies told by the State of Mississippi. I don't find that to be accurate characterization at all.
Therefore, the trial court declined to grant Booker's motion for a new trial. That is, the trial court was not convinced that the prosecution's actions were pretextual. Booker argues that the trial court erred. We disagree.
¶ 13. Precedent dictates that we give great deference to the circuit court's determinations under Batson because such findings are largely based on credibility. Flowers v. State, 947 So.2d 910, 917(¶ 8) (Miss.2007) (Flowers III). In reviewing a claim of a Batson violation, we will not overrule a circuit court unless the record indicates that the circuit court's decision was clearly erroneous or contrary to the overwhelming weight of the evidence. Id. Here, we cannot conclude that the trial court's decision was clearly erroneous or that it was contrary to the overwhelming weight of the evidence.
¶ 14. The State originally struck Thompson on the basis that Thompson had been convicted of four misdemeanors. There is no question that, had that information been correct, that would have been a sufficient race-neutral reason for exercising a peremptory challenge. Id. at 919-20(¶ 13) ("a juror's prior criminal activity has been upheld as a race-neutral reason for exercising a peremptory challenge"). However, Thompson had not been convicted of four misdemeanors. Thompson had been arrested for the four indicated offenses, but he had not been convicted. Instead, the charges against him apparently were dismissed due to a case of mistaken identity.[1]
¶ 15. In Flowers III, a prosecutor offered race-neutral reasons where the prosecutor challenged a potential juror on the basis that he had talked to "numerous officers," and in so doing, the prosecutor learned that those numerous officers "had pretty verbal run-ins with [the potential juror] about his resentment with the law." Id. at 922(¶ 25). The potential juror also had an outstanding warrant for contempt of court. Id.
¶ 16. The Mississippi Supreme Court held that, regardless of the reason the bench warrant was issued or the potential juror's knowledge of it, the fact remained that there was an outstanding warrant for the potential juror at the time of trial. Further, the supreme court held that a juror's criminal history is a valid race-neutral reason for exercising a peremptory strike. Id. at (¶ 26).
¶ 17. The supreme court also upheld a challenge of a potential juror on the basis that the potential juror's son had been arrested on drug charges. Id. at 932 (¶ 54-56). The supreme court noted that the circuit court did not err when it did not require evidence of the potential juror's *420 son's arrest. Id. The supreme court also noted that it had declined to set any limits on the use of any legitimate informational source available to a prosecutor regarding potential jurors. Further, the supreme court explained that a prosecutor does not have to question a juror in open court regarding such information before using it as a racially neutral ground for a peremptory strike. According to the supreme court, such peremptory strikes are permissible as long as the source of the information and the practice itself are not discriminatory. Id. Here, there is no evidence that the source of Lawrence's information or the practice at issue was discriminatory.
¶ 18. In Johnson v. State, 875 So.2d 208, 210(¶ 5) (Miss.2004) (quoting Snow v. State, 800 So.2d 472, 479-81 (Miss.2001)), Justice Kay Cobb, writing for a unanimous Court, referenced Hatten v. State, 628 So.2d 294, 302 (Miss.1993) and stated, "Hatten does not require literal truth in the reason proffered. It only requires that there be some basis in fact sufficient to allow the court to make a reasonable judgment that it is not contrived." In the case presently before us, there was sufficient basis in fact for the circuit court's decision that the prosecutor's stated reason was neither contrived nor improperly racially motivated.
¶ 19. To be entirely clear, this opinion is not to be construed as encouraging false justifications for the exercise of peremptory challenges. What is more, this opinion is not intended to suggest that there is ample potential to abuse the principles in Batson. The principal difficulty in Batson objections is that trial judges are essentially asked to read an attorney's mind to determine the true motive behind a peremptory strike. It is impossible that a trial judge truly knows whether an attorney's reason for a strike is a mere pretext for eliminating a juror for a constitutionally prohibited reason.
¶ 20. This case clearly illustrates why United States Supreme Court Justice Thurgood Marshall and former Mississippi Supreme Court Justice Mike Sullivan believe that peremptory strikes should be relegated to history.[2] It is also quite apparent just why the Mississippi Supreme Court has recently stated, "While we neither abolish peremptory challenges, nor adopt a limited voir dire rule, nor make any specific changes to our peremptory challenge system, we are inclined to consider such options if the attorneys of this State persist in violating the principles of Batson by racially profiling jurors." Flowers III, 947 So.2d at 939(¶ 72). As Justice James Graves stated, "While the Batson test was developed to eradicate racially discriminatory practices in selecting a jury, prosecuting and defending attorneys alike have manipulated Batson to a point that in many instances the voir dire process has devolved into an exercise in finding race neutral reasons to justify racially motivated strikes." Id. (internal quotations omitted).
¶ 21. However, the current state of the law requires that we give great deference to the trial judge, and we cannot conclude that the circuit court abused its discretion. This is particularly so when it is quite apparent that, if district attorney Lawrence had accurate information at the time of his peremptory strike of Thompson, *421 such factually accurate information was clearly still sufficient to establish a non-pretextual race-neutral reason for the strike.
¶ 22. As for Juror 20, Alden Earl Stallworth, the State's reason for striking Stallworth was that the prosecutor once had a contentious civil matter involving members of the Stallworth family. It was later discovered that the Stallworth on the venire panel was not a part of the Stallworth family that the prosecutor once represented. Nonetheless, the trial court found this to be a valid race-neutral reason. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed as race neutral. Gibson v. State, 731 So.2d 1087, 1096(¶ 27) (Miss.1998). This issue is without merit.

3. Whether Booker denied the right to a speedy trial contrary to the Mississippi and United States Constitutions.
¶ 23. Booker claims that the trial court erred in denying his Motion to Dismiss for Failure to Grant a Speedy Trial on September 29, 2003. Booker argues that the period in excess of more than sixteen months between his arrest and date of trial, infringed upon his constitutional rights. The Supreme Court, in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set forth a balancing test to analyze whether or not the state has violated the right of an accused to a speedy trial. That balancing test requires consideration of the following factors: (1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defendant was prejudiced by the delay. Id. at 530, 92 S.Ct. 2182. These factors are closely related and must be considered together. Id. at 533, 92 S.Ct. 2182.

Length of delay
¶ 24. The constitutional right to a speedy trial attaches at the time of arrest. Smith v. State, 550 So.2d 406, 408 (Miss.1986). Booker was arrested on January 6, 2003, and trial began on May 17, 2004. Any delay in excess of eight months is considered presumptively prejudicial and requires a consideration of the other Barker factors. Id. Because there was a total of sixteen months between Booker's arrest and date of trial, this delay is presumptively prejudicial and requires a consideration of the remaining Barker factors.

Reasons for the delay
¶ 25. The record does not reflect that any portion of the delay was caused by Booker. The State gives as the reasons for the delay the unavailability of the court and the time required to conduct an effective investigation. The State contends that the delay was due to the submission of evidence to the Mississippi Crime Lab for analysis and the delay in receiving the completed reports. This Court has previously stated:
The inability to procure evidence vital to a proper completion of a criminal prosecution, as long as the evidence is pursued with some sort of reasonable measure of diligence, does not tend to establish the sort of bad faith delay tactics that call for the enforcement of the constitutional protections given under the Sixth Amendment.
Moore v. State, 837 So.2d 794, 798(¶ 9) (Miss.Ct.App.2003). The State has the obligation to bring a defendant to trial. For this reason we weigh this factor ever so slightly against the State.

Whether the defendant asserted his right to a speedy trial
¶ 26. A defendant's assertion of his speedy trial right is entitled to *422 strong evidentiary weight in determining whether he is being deprived of that right. Barker, 407 U.S. at 531-32, 92 S.Ct. 2182. Before his indictment, Booker filed a motion to dismiss on September 3, 2003, which the trial court denied on September 29, 2003. However, motions to dismiss do not qualify as demands for speedy trial. Perry v. State, 637 So.2d 871, 875 (Miss. 1994). After his indictment, Booker made two demands for a speedy trial: one on February 10, 2004, and another on February 20, 2004, approximately eight months after he was indicted. Because Booker did make a demand for a speedy trial, this factor weighs ever so slightly in his favor.

Prejudice
¶ 27. Booker claims to have been prejudiced by the State's delay in bringing him to trial. Among the specific instances of prejudice claimed by Booker are (1) he was incarcerated at age sixteen, (2) he slept on the floor of a cell block with some six or seven adults, and (3) he was not allowed to attend school. The responsibility to bring a defendant to trial rests upon the State. Therefore the burden of persuasion is on the State to show that any delay did not prejudice the defendant. Anderson v. State, 874 So.2d 1000, 1008 (¶ 34) (Miss.Ct.App.2004). However, absent a showing of actual prejudice, this prong cannot weigh heavily in favor of the defendant. Id. Prejudice resulting from incarceration alone is not enough reason to find actual prejudice. Jefferson v. State, 818 So.2d 1099, 1108(¶ 22) (Miss.2002). "Generally, proof of prejudice beyond incarceration may include such matters as the loss of evidence, death of witnesses, or staleness of the investigation." Moore, 837 So.2d at 799(¶ 13). The possibility of impairment of the defense is the most serious and important consideration in determining whether the defendant suffered actual prejudice. Id. There is nothing in the record before this Court which even remotely suggests any impairment of Booker's defense. None of the witnesses for either the State or Booker were unavailable due to the delay in his trial. There was also no claim of loss of evidence. Other than complaints of prejudice stemming from his incarceration, Booker has no claim of actual prejudice. Therefore, this factor weighs in favor of the State.
¶ 28. Based on this Court's weighing of the Barker factors, we find that this issue is without merit.

4. Therefore the trial court erred in admitting Booker's confession.
¶ 29. Booker argues that the trial court erred in admitting the videotaped confession which he gave to Sergeant Ken McClenic shortly after his arrest. Booker argues that the confession should not have been admitted because his statements were the result of promises from the officers and were given because of his limited learning capacity. Confessions are admissible only if they are voluntarily given and are not the result of promises, threats, or inducements. Edwards v. State, 856 So.2d 587, 594(¶ 24) (Miss.Ct. App.2003) (citing Home v. State, 825 So.2d 627, 639(¶ 43) (Miss.2002)). Whether there has been an intelligent, knowing, and voluntary waiver of the right not to incriminate oneself is a factual issue to be determined by the trial judge from the totality of the circumstances. Neal v. State, 451 So.2d 743, 753 (Miss.1984) (citing Edwards v. Arizona, 451 U.S. 477, 486, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The prosecution bears the burden of proving beyond a reasonable doubt that the confession was voluntary by introducing testimony from an officer, or other person having knowledge of the facts, that the confession was made without threats, coercion, or offer of *423 reward. Edwards, 856 So.2d at 594(¶ 24). Once the trial court has determined that the confession is admissible, the defendant bears a heavy burden of trying to overturn that decision on appeal. Id. (citing Greenlee v. State, 725 So.2d 816, 826(¶ 26) (Miss. 1998)).
¶ 30. After signing a "waiver of rights" form read to him by Sergeant Richard Rader and Lieutenant Kim Versiga on January 6, 2003, Booker began to describe the events leading up to Johnson's death. After finishing another confession, Sergeant McClenic then had Booker follow him into another room to have his confession videotaped. During the suppression hearing, Booker testified that Sergeant Rader promised him treatment as a youthful offender if he told the truth about what happened to Johnson. Sergeants Rader and McClenic, and Lieutenant Versiga all testified that Booker gave his confession voluntarily, and he was not promised anything for his truthfulness. After questions arose about Booker's limited learning capacity, all three again testified that Booker did not seem to have any problems understanding his rights; and he signed the waiver of rights form willingly after his rights were read to him. At the hearing, Booker was able to read aloud for the court each right listed on the waiver. Although he claimed to not remember where he lived, or any of his teachers' names, he acknowledged initialing the waiver in front of the officers.
¶ 31. All of the officers testified that no promises were made to Booker. Although Booker did offer evidence proving that he had a limited learning capacity, a confession will not be excluded merely because the person giving the confession is mentally weak. Neal, 451 So.2d at 756 (quoting Williamson v. State, 330 So.2d 272, 276 (Miss.1976)). Until it is shown that a weak-minded person has been overreached to the end that he has divulged that which he would not have divulged had he not overreached, his voluntary confession is admissible. Id. Given the totality of the circumstances, this Court cannot say that the trial court erred in admitting Booker's videotaped confession into evidence.

5. Whether the trial court erred in permitting Dr. McGarry to express an opinion as to the victim's pain.
¶ 32. Booker argues that because the death penalty was not sought in his case, testimony about the pain that the victim suffered was irrelevant and highly prejudicial. Dr. Paul McGarry, a forensic pathology expert for the State, testified as to Johnson's cause of death. When asked whether Johnson suffered a painful death, Dr. McGarry testified Johnson became unconscious sometime before his death, but that during the infliction of the injuries, Johnson was "very much aware of what was going on, and in great pain." The supreme court has previously held that discussion of pain by a forensic pathologist is admissible. Davis v. State, 743 So.2d 326, 345(¶ 53) (Miss.1999). Therefore, the trial court did not err in admitting that testimony.
¶ 33. Booker also claims that the testimony was in violation of discovery rules. The Uniform Circuit and County Court Rule 9.04(A)(4) requires that the prosecution disclose to the defendant and his attorney a copy of any reports, statements, or opinions of experts. Prior to the beginning of trial, the court ordered the prosecution to supplement discovery as to any of Dr. McGarry's opinions not fully contained within the autopsy report. Booker claims that Dr. McGarry's testimony about Johnson's pain was not included in the report, and should be excluded as a discovery violation. Although there is no *424 indication that Dr. McGarry's testimony was outside the scope of his report, discovery violations are only reversible when there is a clear showing of prejudice. McCoy v. State, 811 So.2d 482, 483(¶ 15) (Miss.Ct.App.2002). Because Dr. McGarry's statements were otherwise admissible, and Booker offers no proof of any real discovery violation, this issue is without merit.

6. Whether the trial court erred in admitting gruesome photographs of the victim.
¶ 34. Booker argues that the trial court erred in admitting into evidence two rather gruesome photographs. He claims that the photographs were prejudicial, and they had no real probative value. Admissibility of gruesome crime scene photographs is within the sound discretion of the trial court. Randolph v. State, 852 So.2d 547, 566(¶ 62) (Miss.2002) (citing Chatman v. State, 761 So.2d 851, 854(¶ 11) (Miss.2001)). Reversal of the trial judge's decision will only occur where there is a clear abuse of discretion. Id. The decision to admit gruesome photographs "runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." Id. (citing Spann v. State, 771 So.2d 883, 895(¶ 29) (Miss. 2000)). Photographs are deemed to have evidentiary value if admitted to: (1) aid in describing the circumstances of the killing, (2) aid in describing the location of the body and cause of death, and (3) supplement or clarify witness testimony. Id.
¶ 35. In this case, Booker claims that the photographs were prejudicial and were only introduced to inflame the jury because they showed the mutilated back of Johnson's head, as well as Johnson's mutilated face. In admitting the photographs, the trial court cited to their relevancy to the cause of Johnson's death and the crime scene investigation. Such a decision is not error. Therefore, this issue is without merit.

7. Whether the trial court erred by not giving the capital petit jurors' oath to the jurors after voir dire.
¶ 36. Booker claims that the jurors did not receive the proper capital petit jurors' oath. Although the record does not state that an oath was given, the sentencing order states that the jury was duly sworn. This Court has previously held that when the record does not show that the jurors were sworn, but the sentencing order reads that jurors were sworn, a rebuttable presumption exists that the trial judge properly performed his/her duties. Stewart v. State, 881 So.2d 919, 923(¶ 13) (Miss.Ct.App.2004). Furthermore, when no objection is made by the defendant about failing to specially swear in the jury until after a verdict has been rendered, the issue cannot be heard on appeal. Id. Therefore, this issue is both procedurally barred and without merit.
¶ 37. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
LEE, P.J., CHANDLER AND GRIFFIS, JJ., CONCUR. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY *425 BARNES, J. MYERS, P.J., IRVING, ISHEE AND CARLTON, JJ., NOT PARTICIPATING.
KING, C.J., Dissenting:
¶ 38. I agree that Booker's conviction should be affirmed. However, I write separately because the majority misses the mark as it wrongly overlooks and dismisses the issue of possible wrongdoing in jury selection. There is no question but what the trial court was given false information regarding the peremptory challenge used against Juror 14, Chauncey Thompson. There is no question but what that false information was relayed to the trial court by the prosecution.
¶ 39. During voir dire, the only discussion of the peremptory challenge as to Chauncey Thompson, is the following:
[PROSECUTOR]: Judge, the first Batson challenge arises with Juror Number 14 Chauncey Thompson. The State's race neutral reason, Judge, is that, in checking the names of our jurors, we found that he has a marijuana conviction, a driver's licence violation, an insurance violation, a seat belt violation in Pascagoula. He was convicted on 2/5/03. And on those bases, especially the marijuana conviction, Judge, we didn't want a convicted marijuana holder on our jury.
....
THE COURT: And that information was verified through what source?
[PROSECUTOR]: Through the Pascagoula City Court.
[DEFENSE ATTORNEY]: We'd like a copy of it. Judge, he's a 29-year-old black male that works at Sears, Roebuck and Company and has a college education, and they want to kick him off. He was born and raised in this county.
THE COURT: Well, I find that the existence of that prior criminal history is sufficiently race-neutral to justify a peremptory challenge, a peremptory strike.
[DEFENSE ATTORNEY]: Judge, I'd like to see it.
THE COURT: If that information is available, Mr. Jones?
[PROSECUTOR]: Yes, sir. It's a matter of record with the Pascagoula Municipal Court. His conviction date is February the 5th, 2003. You can go get it.
[DEFENSE ATTORNEY]: Well, I mean, I don't have access to the Pascagoula Police Department.
[DISTRICT ATTORNEY]: We just called, Your Honor. That's how we got it, over the telephone.
....
[PROSECUTOR]: And I assure you we're not making that up, Judge.
¶ 40. The trial court accepted the State's representations, and struck Thompson from the jury. On August 13, 2004, Booker for the first time presented evidence which established that the State's representations regarding Thompson were false. Booker produced an affidavit from Rhonda Diehl, the Pascagoula City Court Clerk, which stated that on the morning of May 17, 2004, she had informed Investigator Scott McIlrath of the District Attorney's office that Chauncey Thompson, (Juror 14) had been charged with the four misdemeanors, as stated by the prosecution. However, Diehl's affidavit stated that she also told McIlrath that all of the charges had been dismissed by the City because Thompson was not the person who had committed the offenses. Diehl's affidavit stated:
That on the morning of May 17, 2004, Investigator Scott McIlrath, of the District Attorney's Office, Pascagoula, Mississippi called your Affiant and made inquiry as to any criminal record that the potential juror, Chauncey D. Thompson, *426 may have had with said Police Department; that your Affiant ran the name given to her by the Investigator and advised that the potential juror had been charged with four (4) misdemeanor crimes, they being Simple Possession of Marijuana, No Driver's License, No Liability Insurance and a Seat Belt Violation; that your Affiant further advised said Investigator that all of these charges had been dismissed by the City for the reason that said potential juror was not the person who committed said four alleged misdemeanors crimes. Attached hereto is a copy of a print-out that was used by said Affiant when she furnished said Investigator with the information.
¶ 41. At trial, the prosecution informed the trial court that its check with the Pascagoula Municipal Court indicated that Chauncey Thompson had been convicted of four misdemeanor charges on February 5, 2003. Attached to Diehl's affidavit was a document titled "Priors Report." Diehl stated this was the document which she used on May 17, 2004 to respond to Investigator Scott McInrath's inquiry regarding any criminal history of Chauncey Thompson, and informed him that the charges had been dropped. That document listed four charges against an individual named Chauncey Deontae Thompson. For each of those four charges, that report indicated the disposition as "Nolle Pros By Prosecution The Judgement Date Is 2/05/2003 Wrong Person." The date, February 5, 2003, upon which these charges were dismissed, is the same date the prosecution represented to the trial court to be the date of actual convictions of Thompson. The prosecution's representation that Chauncey Thompson had been convicted of four misdemeanor offenses in the Pascagoula Municipal Court was clearly false.
¶ 42. Investigator McIlrath, who obtained the information from the Pascagoula Municipal Court was not some freelance investigator, who worked independently of the prosecutor. He was a very significant part of the prosecution team. This fact is clearly indicated by the district attorney's remarks at trial, as he describes how he obtained the information on Thompson. He said, "we just called Your Honor. That's how we got it, over the telephone." Because Investigator McIlrath is a significant member of the prosecution team, he is held to the same standard of conduct as the district attorney.
¶ 43. Rule 5.3(b) of the Rules of Professional Conduct, provides, "With respect to a non-lawyer employed or retained by or associated with a lawyer: (b) a lawyer having direct supervisory authority over the non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." Under Rule 5.3(b) the district attorney had an obligation to reasonably insure that Investigator McIlrath observed the requirements of Rule 3.3 of the Rules of Professional Conduct, which requires: "Candor Toward The Tribunal." Rule 3.3(a)(1) provides, "A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal." The record is clear that the statements made regarding Chauncey Thompson were false. The record is clear that the statements regarding Chauncey Thompson were material. What is not clear is whether the false statements were knowingly made.
¶ 44. The record before this Court is insufficient to allow it to determine whether these false statements were deliberate or inadvertent. Diehl's affidavit states that on the morning of May 17, 2004, she informed Investigator McIlrath that the charges against Thompson had been dismissed *427 due to mistaken identity. However, in the argument on the motion for new trial, the prosecution stated that it was unaware on May 17, 2004, that the charges against Thompson had been dismissed. The prosecution's claim that on May 17, 2004, it was unaware that the charges against Chauncey Thompson had been dismissed is clearly contradicted by the affidavit of Diehl.
¶ 45. The majority's mere dismissal of this matter creates the potential for great mischief. Under the position taken by the majority, a prosecutor need only stick his head in the sand like the ostrich, while claiming a lack of knowledge of the actions taken by his subordinates. That position is contrary to the obligations placed upon attorneys under the Rules of Professional Conduct.
¶ 46. However, the potential for mischief is enhanced when this Court abdicates its responsibility, and likewise emulates the ostrich by sticking its collective head in the sand. The majority justifies its emulation of the ostrich by saying (1) that Batson is difficult to enforce in that it requires the ability to read minds, and (2) this Court is required to defer to the trial judge. Under the facts of this case, it may be convenient to embrace those statements, but mere convenience does not provide validation for doing so.
¶ 47. If there was a deliberate false statement by any member of the prosecution team which impacted the process of jury selection, then sanctions are appropriate. I would therefore remand to the trial court the issue of (1) whether the misinformation regarding Chauncey Thompson was a deliberate dissemination of misinformation, (2) if it was a deliberate dissemination of misinformation, then who was the responsible party, and (3) if the dissemination was by a person associated with the prosecution, what, if any, sanctions should be imposed upon the prosecution for what the record now clearly reflects was a false statement.
BARNES, J., Joins this Opinion.
NOTES
[1] The affidavit from the Pascagoula City Court Clerk, Rhonda Diehl, indicates that the charges against Thompson, simple possession of marijuana, no driver's license, no liability insurance, and a seat belt violation, had been nol prossed by the prosecution because the "wrong person" was charged. Although not necessarily relevant to the issue, it does seem quite extraordinary, if not impossible, that law enforcement could charge a "wrong person" with failure to have a driver's license, failure to have liability insurance, and a seat belt violation. The only possible explanation is that Thompson has an identical twin.
[2] When the U.S. Supreme Court handed down Batson, Justice Marshall wrote a concurring opinion and stated, "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." Batson, 476 U.S. at 105, 106 S.Ct. 1712 (Marshall, J., concurring). According to Justice Sullivan, the proper remedy is elimination of peremptory challenges. Thorson v. State, 653 So.2d 876, 896 (Miss. 1994).